POWELL *v.* TEXAS.

No. 405.   Argued March 7, 1968.—Decided June 17, 1968.

516

*Don L. Davis* argued the cause for appellant, *pro hac vice*. With him on the briefs was *Tom H. Davis*.

*David Robinson, Jr.,* argued the cause for appellee. With him on the briefs were *Crawford C. Martin,* Attorney General of Texas, *George M. Cowden,* First Assistant Attorney General, *R. L. Lattimore* and *Lonny F. Zwiener,* Assistant Attorneys General, and *A. J. Carubbi, Jr.*

*Peter Barton Hutt* argued the cause for the American Civil Liberties Union et al., as *amici curiae,* urging reversal. With him on the brief was *Richard A. Merrill.*

Briefs of *amici curiae,* urging reversal, were filed by *Paul O'Dwyer* for the National Council on Alcoholism, and by the Philadelphia Diagnostic and Relocation Services Corp.

MR. JUSTICE MARSHALL announced the judgment of the Court and delivered an opinion in which THE CHIEF

JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE HARLAN join.

In late December 1966, appellant was arrested and charged with being found in a state of intoxication in a public place, in violation of Texas Penal Code, Art. 477 (1952), which reads as follows:

"Whoever shall get drunk or be found in a state of intoxication in any public place, or at any private house except his own, shall be fined not exceeding one hundred dollars."

Appellant was tried in the Corporation Court of Austin, Texas, found guilty, and fined $20. He appealed to the County Court at Law No. 1 of Travis County, Texas, where a trial *de novo* was held. His counsel urged that appellant was "afflicted with the disease of chronic alcoholism," that "his appearance in public [while drunk was] . . . not of his own volition," and therefore that to punish him criminally for that conduct would be cruel and unusual, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

The trial judge in the county court, sitting without a jury, made certain findings of fact, *infra*, at 521, but ruled as a matter of law that chronic alcoholism was not a defense to the charge. He found appellant guilty, and fined him $50. There being no further right to appeal within the Texas judicial system,[1] appellant appealed to this Court; we noted probable jurisdiction. 389 U. S. 810 (1967).

## I.

The principal testimony was that of Dr. David Wade, a Fellow of the American Medical Association, duly certificated in psychiatry. His testimony consumed a total of 17 pages in the trial transcript. Five of those pages were taken up with a recitation of Dr. Wade's qualifica-

---

[1] Tex. Code Crim. Proc., Art. 4.03 (1966).

tions.   In the next 12 pages Dr. Wade was examined by appellant's counsel, cross-examined by the State, and re-examined by the defense, and those 12 pages contain virtually all the material developed at trial which is relevant to the constitutional issue we face here.   Dr. Wade sketched the outlines of the "disease" concept of alcoholism; noted that there is no generally accepted definition of "alcoholism"; alluded to the ongoing debate within the medical profession over whether alcohol is actually physically "addicting" or merely psychologically "habituating"; and concluded that in either case a "chronic alcoholic" is an "involuntary drinker," who is "powerless not to drink," and who "loses his self-control over his drinking."   He testified that he had examined appellant, and that appellant is a "chronic alcoholic," who "by the time he has reached [the state of intoxication] . . . is not able to control his behavior, and [who] . . . has reached this point because he has an uncontrollable compulsion to drink."   Dr. Wade also responded in the negative to the question whether appellant has "the willpower to resist the constant excessive consumption of alcohol."   He added that in his opinion jailing appellant without medical attention would operate neither to rehabilitate him nor to lessen his desire for alcohol.

On cross-examination, Dr. Wade admitted that when appellant was sober he knew the difference between right and wrong, and he responded affirmatively to the question whether appellant's act of taking the first drink in any given instance when he was sober was a "voluntary exercise of his will."   Qualifying his answer, Dr. Wade stated that "these individuals have a compulsion, and this compulsion, while not completely overpowering, is a very strong influence, an exceedingly strong influence, and this compulsion coupled with the firm belief in their mind that they are going to be able to handle it from now on causes their judgment to be somewhat clouded."

Appellant testified concerning the history of his drinking problem. He reviewed his many arrests for drunkenness; testified that he was unable to stop drinking; stated that when he was intoxicated he had no control over his actions and could not remember them later, but that he did not become violent; and admitted that he did not remember his arrest on the occasion for which he was being tried. On cross-examination, appellant admitted that he had had one drink on the morning of the trial and had been able to discontinue drinking. In relevant part, the cross-examination went as follows:

"Q. You took that one at eight o'clock because you wanted to drink?

"A. Yes, sir.

"Q. And you knew that if you drank it, you could keep on drinking and get drunk?

"A. Well, I was supposed to be here on trial, and I didn't take but that one drink.

"Q. You knew you had to be here this afternoon, but this morning you took one drink and then you knew that you couldn't afford to drink any more and come to court; is that right?

"A. Yes, sir, that's right.

"Q. So you exercised your will power and kept from drinking anything today except that one drink?

"A. Yes, sir, that's right.

"Q. Because you knew what you would do if you kept drinking, that you would finally pass out or be picked up?

"A. Yes, sir.

"Q. And you didn't want that to happen to you today?

"A. No, sir.

"Q. Not today?

"A. No, sir.

"Q. So you only had one drink today?

"A. Yes, sir."

On redirect examination, appellant's lawyer elicited the following:

"Q. Leroy, isn't the real reason why you just had one drink today because you just had enough money to buy one drink?

"A. Well, that was just give to me.

"Q. In other words, you didn't have any money with which you could buy any drinks yourself?

"A. No, sir, that was give to me.

"Q. And that's really what controlled the amount you drank this morning, isn't it?

"A. Yes, sir.

"Q. Leroy, when you start drinking, do you have any control over how many drinks you can take?

"A. No, sir."

Evidence in the case then closed. The State made no effort to obtain expert psychiatric testimony of its own, or even to explore with appellant's witness the question of appellant's power to control the frequency, timing, and location of his drinking bouts, or the substantial disagreement within the medical profession concerning the nature of the disease, the efficacy of treatment and the prerequisites for effective treatment. It did nothing to examine or illuminate what Dr. Wade might have meant by his reference to a "compulsion" which was "not completely overpowering," but which was "an exceedingly strong influence," or to inquire into the question of the proper role of such a "compulsion" in constitutional adjudication. Instead, the State contented itself with a brief argument that appellant had no defense to the charge because he "is legally sane and knows the difference between right and wrong."

Following this abbreviated exposition of the problem before it, the trial court indicated its intention to disallow appellant's claimed defense of "chronic alcoholism." Thereupon defense counsel submitted, and the trial court entered, the following "findings of fact":

"(1) That chronic alcoholism is a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol.

"(2) That a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism.

"(3) That Leroy Powell, defendant herein, is a chronic alcoholic who is afflicted with the disease of chronic alcoholism."

Whatever else may be said of them, those are not "findings of fact" in any recognizable, traditional sense in which that term has been used in a court of law; they are the premises of a syllogism transparently designed to bring this case within the scope of this Court's opinion in *Robinson* v. *California,* 370 U. S. 660 (1962). Nonetheless, the dissent would have us adopt these "findings" without critical examination; it would use them as the basis for a constitutional holding that "a person may not be punished if the condition essential to constitute the defined crime is part of the pattern of his disease and is occasioned by a compulsion symptomatic of the disease." *Post,* at 569.

The difficulty with that position, as we shall show, is that it goes much too far on the basis of too little knowledge. In the first place, the record in this case is utterly inadequate to permit the sort of informed and responsible adjudication which alone can support the announcement of an important and wide-ranging new constitutional principle. We know very little about the circumstances surrounding the drinking bout which re-

sulted in this conviction, or about Leroy Powell's drinking problem, or indeed about alcoholism itself. The trial hardly reflects the sharp legal and evidentiary clash between fully prepared adversary litigants which is traditionally expected in major constitutional cases. The State put on only one witness, the arresting officer. The defense put on three—a policeman who testified to appellant's long history of arrests for public drunkenness, the psychiatrist, and appellant himself.

Furthermore, the inescapable fact is that there is no agreement among members of the medical profession about what it means to say that "alcoholism" is a "disease." One of the principal works in this field states that the major difficulty in articulating a "disease concept of alcoholism" is that "alcoholism has too many definitions and disease has practically none." [2] This same author concludes that "*a disease is what the medical profession recognizes as such.*" [3] In other words, there is widespread agreement today that "alcoholism" is a "disease," for the simple reason that the medical profession has concluded that it should attempt to treat those who have drinking problems. There the agreement stops. Debate rages within the medical profession as to whether "alcoholism" is a separate "disease" in any meaningful biochemical, physiological or psychological sense, or whether it represents one peculiar manifestation in some individuals of underlying psychiatric disorders.[4]

Nor is there any substantial consensus as to the "manifestations of alcoholism." E. M. Jellinek, one of the outstanding authorities on the subject, identifies five

---

[2] E. Jellinek, The Disease Concept of Alcoholism 11 (1960).

[3] *Id.*, at 12 (emphasis in original).

[4] See, *e. g.*, Joint Information Serv. of the Am. Psychiatric Assn. & the Nat. Assn. for Mental Health, The Treatment of Alcoholism—A Study of Programs and Problems 6–8 (1967) (hereafter cited as Treatment of Alcoholism).

different types of alcoholics which predominate in the United States, and these types display a broad range of different and occasionally inconsistent symptoms.[5] Moreover, wholly distinct types, relatively rare in this country, predominate in nations with different cultural attitudes regarding the consumption of alcohol.[6] Even if we limit our consideration to the range of alcoholic symptoms more typically found in this country, there is substantial disagreement as to the manifestations of the "disease" called "alcoholism." Jellinek, for example, considers that only two of his five alcoholic types can truly be said to be suffering from "alcoholism" as a "disease," because only these two types attain what he believes to be the requisite degree of physiological dependence on alcohol.[7] He applies the label "gamma alcoholism" to "that species of alcoholism in which (1) acquired increased tissue tolerance to alcohol, (2) adaptive cell metabolism . . . , (3) withdrawal symptoms and 'craving,' i. e., physical dependence, and (4) loss of control are involved."[8] A "delta" alcoholic, on the other hand, "shows the first three characteristics of gamma alcoholism as well as a less marked form of the fourth characteristic—that is, instead of loss of control

---

[5] Jellinek, *supra*, n. 2, at 35–41.

[6] For example, in nations where large quantities of wine are customarily consumed with meals, apparently there are many people who are completely unaware that they have a "drinking problem"— they rarely if ever show signs of intoxication, they display no marked symptoms of behavioral disorder, and are entirely capable of limiting their alcoholic intake to a reasonable amount—and yet who display severe withdrawal symptoms, sometimes including delirium tremens, when deprived of their daily portion of wine. M. Block, Alcoholism—Its Facets and Phases 27 (1965); Jellinek, *supra*, n. 2, at 17. See generally *id.*, at 13–32.

[7] Jellinek, *supra*, n. 2, at 40.

[8] Jellinek, *supra*, n. 2, at 37.

there is inability to abstain." [9]   Other authorities approach the problems of classification in an entirely different manner and, taking account of the large role which psycho-social factors seem to play in "problem drinking," define the "disease" in terms of the earliest identifiable manifestations of any sort of abnormality in drinking patterns.[10]

Dr. Wade appears to have testified about appellant's "chronic alcoholism" in terms similar to Jellinek's "gamma" and "delta" types, for these types are largely defined, in their later stages, in terms of a strong compulsion to drink, physiological dependence and an inability to abstain from drinking.   No attempt was made in the court below, of course, to determine whether Leroy Powell could in fact properly be diagnosed as a "gamma" or "delta" alcoholic in Jellinek's terms.   The focus at the trial, and in the dissent here, has been exclusively upon the factors of loss of control and inability to abstain. Assuming that it makes sense to compartmentalize in this manner the diagnosis of such a formless "disease," tremendous gaps in our knowledge remain, which the record in this case does nothing to fill.

The trial court's "finding" that Powell "is afflicted with the disease of chronic alcoholism," which "destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol" covers a multitude of sins. Dr. Wade's testimony that appellant suffered from a compulsion which was an "exceedingly strong influence," but which was "not completely overpowering" is at least more carefully stated, if no less mystifying.   Jellinek insists that conceptual clarity can only be achieved by distinguishing carefully between "loss of control" once an individual has commenced to drink and "inability to abstain"

---

[9] *Id.*, at 38.

[10] See Block, *supra*, n. 6, at 19–49.

from drinking in the first place.[11]   Presumably a person would have to display both characteristics in order to make out a constitutional defense, should one be recognized.   Yet the "findings" of the trial court utterly fail to make this crucial distinction, and there is serious question whether the record can be read to support a finding of either loss of control or inability to abstain.

Dr. Wade did testify that once appellant began drinking he appeared to have no control over the amount of alcohol he finally ingested.   Appellant's own testimony concerning his drinking on the day of the trial would certainly appear, however, to cast doubt upon the conclusion that he was without control over his consumption of alcohol when he had sufficiently important reasons to exercise such control.   However that may be, there are more serious factual and conceptual difficulties with reading this record to show that appellant was unable to abstain from drinking.   Dr. Wade testified that when appellant was sober, the act of taking the first drink was a "voluntary exercise of his will," but that this exercise of will was undertaken under the "exceedingly strong influence" of a "compulsion" which was "not completely overpowering."   Such concepts, when juxtaposed in this fashion, have little meaning.

Moreover, Jellinek asserts that it cannot accurately be said that a person is truly unable to abstain from drinking unless he is suffering the physical symptoms of withdrawal.[12]   There is no testimony in this record that Leroy Powell underwent withdrawal symptoms either before he began the drinking spree which resulted in the conviction under review here, or at any other time.   In attempting to deal with the alcoholic's desire for drink in the absence of withdrawal symptoms, Jellinek is re-

---

[11] Jellinek, *supra*, n. 2, at 41–42.

[12] *Id.*, at 43.

duced to unintelligible distinctions between a "compulsion" (a "psychopathological phenomenon" which can apparently serve in some instances as the functional equivalent of a "craving" or symptom of withdrawal) and an "impulse" (something which differs from a loss of control, a craving or a compulsion, and to which Jellinek attributes the start of a new drinking bout for a "gamma" alcoholic).[13] Other scholars are equally unhelpful in articulating the nature of a "compulsion." [14]

It is one thing to say that if a man is deprived of alcohol his hands will begin to shake, he will suffer agonizing pains and ultimately he will have hallucinations; it is quite another to say that a man has a "compulsion" to take a drink, but that he also retains a certain amount of "free will" with which to resist. It is simply impossible, in the present state of our knowledge, to ascribe a useful meaning to the latter statement. This definitional confusion reflects, of course, not merely the undeveloped state of the psychiatric art but also the conceptual difficulties inevitably attendant upon the importation of scientific and medical models· into a legal system generally predicated upon a different set of assumptions.[15]

## II.

Despite the comparatively primitive state of our knowledge on the subject, it cannot be denied that the destructive use of alcoholic beverages is one of our prin-

---

[13] *Id.*, at 41–44.

Dr. Wade did not clarify matters when he testified at trial that a chronic alcoholic suffers from "the same type of compulsion" as a "compulsive eater."

[14] See, *e. g.*, Block, *supra*, n. 6, at 40, 55, 308; Treatment of Alcoholism 6–8; Note, Alcoholism, Public Intoxication and the Law, 2 Col. J. Law & Soc. Prob. 109, 112–114 (1966).

[15] See *Washington* v. *United States*, —— U. S. App. D. C. ——, —— ––––, 390 F. 2d 444, 446–456 (1967).

cipal social and public health problems.[16] The lowest current informed estimate places the number of "alcoholics" in America (definitional problems aside) at 4,000,000,[17] and most authorities are inclined to put the figure considerably higher.[18] The problem is compounded by the fact that a very large percentage of the alcoholics in this country are "invisible"—they possess the means to keep their drinking problems secret, and the traditionally uncharitable attitude of our society toward alcoholics causes many of them to refrain from seeking treatment from any source.[19] Nor can it be gainsaid that the legislative response to this enormous problem has in general been inadequate.

There is as yet no known generally effective method for treating the vast number of alcoholics in our society. Some individual alcoholics have responded to particular forms of therapy with remissions of their symptomatic dependence upon the drug. But just as there is no agreement among doctors and social workers with respect to the causes of alcoholism, there is no consensus as to why particular treatments have been effective in particular cases and there is no generally agreed-upon approach to the problem of treatment on a large scale.[20] Most psychiatrists are apparently of the opinion that alcoholism is far more difficult to treat than other forms of behavioral disorders, and some believe it is impossible

---

[16] See generally Block, *supra,* n. 6, at 19–30, 43–49.

[17] See Treatment of Alcoholism 11.

[18] Block, *supra,* n. 6, at 43–44; Blum & Braunstein, Mind-altering Drugs and Dangerous Behavior: Alcohol, in President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Drunkenness 29, 30 (1967); Note, 2 Col. J. Law & Soc. Prob. 109 (1966).

[19] See Block, *supra,* n. 6, at 74–81; Note, 2 Col. J. Law & Soc. Prob. 109 (1966).

[20] See Treatment of Alcoholism 13–17.

to cure by means of psychotherapy; indeed, the medical profession as a whole, and psychiatrists in particular, have been severely criticised for the prevailing reluctance to undertake the treatment of drinking problems.[21] Thus it is entirely possible that, even were the manpower and facilities available for a full-scale attack upon chronic alcoholism, we would find ourselves unable to help the vast bulk of our "visible"—let alone our "invisible"—alcoholic population.

However, facilities for the attempted treatment of indigent alcoholics are woefully lacking throughout the country.[22] It would be tragic to return large numbers of helpless, sometimes dangerous and frequently unsanitary inebriates to the streets of our cities without even the opportunity to sober up adequately which a brief jail term provides. Presumably no State or city will tolerate

---

[21] *Id.,* at 18–26.

[22] Encouraging pilot projects do exist. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Drunkenness 50–64, 82–108 (1967). But the President's Commission concluded that the "strongest barrier" to the abandonment of the current use of the criminal process to deal with public intoxication "is that there presently are no clear alternatives for taking into custody and treating those who are now arrested as drunks." President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 235 (1967). Moreover, even if massive expenditures for physical plants were forthcoming, there is a woeful shortage of trained personnel to man them. One study has concluded that:

"[T]here is little likelihood that the number of workers in these fields could be sufficiently increased to treat even a large minority of problem drinkers. In California, for instance, according to the best estimate available, providing all problem drinkers with weekly contact with a psychiatrist and once-a-month contact with a social worker would require the full time work of *every* psychiatrist and *every* trained social worker in the United States." Cooperative Commission on Study of Alcoholism, Alcohol Problems 120 (1967) (emphasis in original).

such a state of affairs. Yet the medical profession cannot, and does not, tell us with any assurance that, even if the buildings, equipment and trained personnel were made available, it could provide anything more than slightly higher-class jails for our indigent habitual inebriates. Thus we run the grave risk that nothing will be accomplished beyond the hanging of a new sign—reading "hospital"—over one wing of the jailhouse.[23]

One virtue of the criminal process is, at least, that the duration of penal incarceration typically has some outside statutory limit; this is universally true in the case of petty offenses, such as public drunkenness, where jail terms are quite short on the whole. "Therapeutic civil commitment" lacks this feature; one is typically committed until one is "cured." Thus, to do otherwise than affirm might subject indigent alcoholics to the risk that they may be locked up for an indefinite period of time under the same conditions as before, with no more hope than before of receiving effective treatment and no prospect of periodic "freedom." [24]

---

[23] For the inadequate response in the District of Columbia following *Easter* v. *District of Columbia*, 124 U. S. App. D. C. 33, 361 F. 2d 50 (1966), which held on constitutional and statutory grounds that a chronic alcoholic could not be punished for public drunkenness, see President's Commission on Crime in the District of Columbia, Report 486–490 (1966).

[24] Counsel for *amici curiae* ACLU et al., who has been extremely active in the recent spate of litigation dealing with public intoxication statutes and the chronic inebriate, recently told an annual meeting of the National Council on Alcoholism:

"We have not fought for two years to extract DeWitt Easter, Joe Driver, and their colleagues from jail, only to have them involuntarily committed for an even longer period of time, with no assurance of appropriate rehabilitative help and treatment. . . . The euphemistic name 'civil commitment' can easily hide nothing more than permanent incarceration. . . . I would caution those who might rush headlong to adopt civil commitment procedures and

Faced with this unpleasant reality, we are unable to assert that the use of the criminal process as a means of dealing with the public aspects of problem drinking can never be defended as rational. The picture of the penniless drunk propelled aimlessly and endlessly through the law's "revolving door" of arrest, incarceration, release and re-arrest is not a pretty one. But before we condemn the present practice across-the-board, perhaps we ought to be able to point to some clear promise of a better world for these unfortunate people. Unfortunately, no such promise has yet been forthcoming. If, in addition to the absence of a coherent approach to the problem of treatment, we consider the almost complete absence of facilities and manpower for the implementation of a rehabilitation program, it is difficult to say in the present context that the criminal process is utterly lacking in social value. This Court has never held that anything in the Constitution requires that penal sanctions be designed solely to achieve therapeutic or rehabilitative effects, and it can hardly be said with assurance that incarceration serves such purposes any better for the general run of criminals than it does for public drunks.

Ignorance likewise impedes our assessment of the deterrent effect of criminal sanctions for public drunkenness. The fact that a high percentage of American alcoholics conceal their drinking problems, not merely by avoiding public displays of intoxication but also by shunning all forms of treatment, is indicative that some powerful deterrent operates to inhibit the public revela-

---

remind them that just as difficult legal problems exist there as with the ordinary jail sentence."

Quoted in Robitscher, Psychiatry and Changing Concepts of Criminal Responsibility, 31 Fed. Prob. 44, 49 (No. 3, Sept. 1967). Cf. Note, The Nascent Right to Treatment, 53 Va. L. Rev. 1134 (1967).

tion of the existence of alcoholism. Quite probably this deterrent effect can be largely attributed to the harsh moral attitude which our society has traditionally taken toward intoxication and the shame which we have associated with alcoholism. Criminal conviction represents the degrading public revelation of what Anglo-American society has long condemned as a moral defect, and the existence of criminal sanctions may serve to reinforce this cultural taboo, just as we presume it serves to reinforce other, stronger feelings against murder, rape, theft, and other forms of antisocial conduct.

Obviously, chronic alcoholics have not been deterred from drinking to excess by the existence of criminal sanctions against public drunkenness. But all those who violate penal laws of any kind are by definition undeterred. The long-standing and still raging debate over the validity of the deterrence justification for penal sanctions has not reached any sufficiently clear conclusions to permit it to be said that such sanctions are ineffective in any particular context or for any particular group of people who are able to appreciate the consequences of their acts. Certainly no effort was made at the trial of this case, beyond a monosyllabic answer to a perfunctory one-line question, to determine the effectiveness of penal sanctions in deterring Leroy Powell in particular or chronic alcoholics in general from drinking at all or from getting drunk in particular places or at particular times.

### III.

Appellant claims that his conviction on the facts of this case would violate the Cruel and Unusual Punishment Clause of the Eighth Amendment as applied to the States through the Fourteenth Amendment. The primary purpose of that clause has always been considered, and properly so, to be directed at the method or kind of

punishment imposed for the violation of criminal statutes; the nature of the conduct made criminal is ordinarily relevant only to the fitness of the punishment imposed.  See, *e. g., Trop* v. *Dulles,* 356 U. S. 86 (1958); *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947); *Weems* v. *United States,* 217 U. S. 349 (1910).[25]

Appellant, however, seeks to come within the application of the Cruel and Unusual Punishment Clause announced in *Robinson* v. *California,* 370 U. S. 660 (1962), which involved a state statute making it a crime to "be addicted to the use of narcotics."  This Court held there that "a state law which imprisons a person thus afflicted [with narcotic addiction] as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment . . . . " *Id.,* at 667.

On its face the present case does not fall within that holding, since appellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion.  The State of Texas thus has not sought to punish a mere status, as California did in *Robinson;* nor has it attempted to regulate appellant's behavior in the privacy of his own home.  Rather, it has imposed upon appellant a criminal sanction for public behavior which may create substantial health and safety hazards, both for appellant and for members of the general public, and which offends the moral and esthetic sensibilities of a large segment of the community.  This seems a far cry from convicting one for being an addict, being a chronic alcoholic, being "mentally ill, or a leper . . . ." *Id.,* at 666.

---

[25] See generally Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv. L. Rev. 635 (1966).

*Robinson* so viewed brings this Court but a very small way into the substantive criminal law. And unless *Robinson* is so viewed it is difficult to see any limiting principle that would serve to prevent this Court from becoming, under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country.

It is suggested in dissent that *Robinson* stands for the "simple" but "subtle" principle that "[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." *Post*, at 567. In that view, appellant's "condition" of public intoxication was "occasioned by a compulsion symptomatic of the disease" of chronic alcoholism, and thus, apparently, his behavior lacked the critical element of *mens rea*. Whatever may be the merits of such a doctrine of criminal responsibility, it surely cannot be said to follow from *Robinson*. The entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, "involuntary" or "occasioned by a compulsion."

Likewise, as the dissent acknowledges, there is a substantial definitional distinction between a "status," as in *Robinson*, and a "condition," which is said to be involved in this case. Whatever may be the merits of an attempt to distinguish between behavior and a condition, it is perfectly clear that the crucial element in this case, so far as the dissent is concerned, is whether or not appellant can legally be held responsible for his

appearance in public in a state of intoxication. The only relevance of *Robinson* to this issue is that because the Court interpreted the statute there involved as making a "status" criminal, it was able to suggest that the statute would cover even a situation in which addiction had been acquired involuntarily. 370 U. S., at 667, n. 9. That this factor was not determinative in the case is shown by the fact that there was no indication of how Robinson himself had become an addict.

Ultimately, then, the most troubling aspects of this case, were *Robinson* to be extended to meet it, would be the scope and content of what could only be a constitutional doctrine of criminal responsibility. In dissent it is urged that the decision could be limited to conduct which is "a characteristic and involuntary part of the pattern of the disease as it afflicts" the particular individual, and that "[i]t is not foreseeable" that it would be applied "in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery." *Post,* at 559, n. 2. That is limitation by fiat. In the first place, nothing in the logic of the dissent would limit its application to chronic alcoholics. If Leroy Powell cannot be. convicted of public intoxication, it is difficult to see how a State can convict an individual for murder, if that individual, while exhibiting normal behavior in all other respects, suffers from a "compulsion" to kill, which is an "exceedingly strong influence," but "not .completely overpowering." [26] Even if we limit our consideration to chronic alcoholics, it would seem impossible to confine the principle within the arbitrary bounds which the dissent seems to envision.

It is not difficult to imagine a case involving psychiatric testimony to the effect that an individual suffers

[26] Cf. *Commonwealth* v. *Phelan,* 427 Pa. 265, 234 A. 2d 540 (1967), cert. denied, 391 U. S. 920 (1968).

from some aggressive neurosis which he is able to control when sober; that very little alcohol suffices to remove the inhibitions which normally contain these aggressions, with the result that the individual engages in assaultive behavior without becoming actually intoxicated; and that the individual suffers from a very strong desire to drink, which is an "exceedingly strong influence" but "not completely overpowering." Without being untrue to the rationale of this case, should the principles advanced in dissent be accepted here, the Court could not avoid holding such an individual constitutionally unaccountable for his assaultive behavior.

Traditional common-law concepts of personal accountability and essential considerations of federalism lead us to disagree with appellant. We are unable to conclude, on the state of this record or on the current state of medical knowledge, that chronic alcoholics in general, and Leroy Powell in particular, suffer from such an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication. And in any event this Court has never articulated a general constitutional doctrine of *mens rea*.[27]

We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral

---

[27] The Court did hold in *Lambert* v. *California*, 355 U. S. 225 (1957), that a person could not be punished for a "crime" of omission, if that person did not know, and the State had taken no reasonable steps to inform him, of his duty to act and of the criminal penalty for failure to do so. It is not suggested either that *Lambert* established a constitutional doctrine of *mens rea*, see generally Packer, Mens Rea and the Supreme Court, 1962 Sup. Ct. Rev. 107, or that appellant in this case was not fully aware of the prohibited nature of his conduct and of the consequences of taking his first drink.

accountability of an individual for his antisocial deeds.[28] The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.

Nothing could be less fruitful than for this Court to be impelled into defining some sort of insanity test in constitutional terms. Yet, that task would seem to follow inexorably from an extension of *Robinson* to this case. If a person in the "condition" of being a chronic alcoholic cannot be criminally punished as a constitutional matter for being drunk in public, it would seem to follow that a person who contends that, in terms of one test, "his unlawful act was the product of mental disease or mental defect," *Durham* v. *United States,* 94 U. S. App. D. C. 228, 241, 214 F. 2d 862, 875 (1954), would state an issue of constitutional dimension with regard to his criminal responsibility had he been tried under some different and perhaps lesser standard, *e. g.,* the right-wrong test of *M'Naghten's Case.*[29] The experimentation of one jurisdiction in that field alone indicates the magnitude of the problem. See, *e. g., Carter* v. *United States,* 102 U. S. App. D. C. 227, 252 F. 2d 608 (1957); *Blocker* v. *United States,* 107 U. S. App. D. C. 63, 274 F. 2d 572 (1959); *Blocker* v. *United States,* 110 U. S. App. D. C. 41, 288 F. 2d 853 (1961) *(en banc); McDonald* v. *United States,* 114 U. S. App. D. C. 120, 312 F. 2d 847 (1962) *(en banc); Washington* v. *United States,* —— U. S. App. D. C. ——, 390 F. 2d 444 (1967). But formulating a constitutional rule would reduce, if not eliminate, that fruitful

---

[28] See generally Sayre, Mens Rea, 45 Harv. L. Rev. 974 (1932).

[29] 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843).

experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. It is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers.

*Affirmed.*

Mr. Justice Black, whom Mr. Justice Harlan joins, concurring.

While I agree that the grounds set forth in Mr. Justice Marshall's opinion are sufficient to require affirmance of the judgment here, I wish to amplify my reasons for concurring.

Those who favor the change now urged upon us rely on their own notions of the wisdom of this Texas law to erect a constitutional barrier, the desirability of which is far from clear. To adopt this position would significantly limit the States in their efforts to deal with a widespread and important social problem and would do so by announcing a revolutionary doctrine of constitutional law that would also tightly restrict state power to deal with a wide variety of other harmful conduct.

## I.

Those who favor holding that public drunkenness cannot be made a crime rely to a large extent on their own notions of the wisdom of such a change in the law. A great deal of medical and sociological data is cited to us in support of this change. Stress is put upon the fact that medical authorities consider alcoholism a disease and have urged a variety of medical approaches to treating it. It is pointed out that a high percentage of all arrests in America are for the crime of public drunkenness and that the enforcement of these laws constitutes a tremendous burden on the police. Then it is argued that

there is no basis whatever for claiming that to jail chronic alcoholics can be a deterrent or a means of treatment; on the contrary, jail has, in the expert judgment of these scientists, a destructive effect. All in all, these arguments read more like a highly technical medical critique than an argument for deciding a question of constitutional law one way or another.

Of course, the desirability of this Texas statute should be irrelevant in a court charged with the duty of interpretation rather than legislation, and that should be the end of the matter. But since proponents of this grave constitutional change insist on offering their pronouncements on these questions of medical diagnosis and social policy, I am compelled to add that, should we follow their arguments, the Court would be venturing far beyond the realm of problems for which we are in a position to know what we are talking about.

Public drunkenness has been a crime throughout our history, and even before our history it was explicitly proscribed by a 1606 English statute, 4 Jac. 1, c. 5. It is today made an offense in every State in the Union. The number of police to be assigned to enforcing these laws and the amount of time they should spend in the effort would seem to me a question for each local community. Never, even by the wildest stretch of this Court's judicial review power, could it be thought that a State's criminal law could be struck down because the amount of time spent in enforcing it constituted, in some expert's opinion, a tremendous burden.

Jailing of chronic alcoholics is definitely defended as therapeutic, and the claims of therapeutic value are not insubstantial. As appellee notes, the alcoholics are removed from the streets, where in their intoxicated state they may be in physical danger, and are given food, clothing, and shelter until they "sober up" and thus at least regain their ability to keep from being run over by

automobiles in the street. Of course, this treatment may not be "therapeutic" in the sense of curing the underlying causes of their behavior, but it seems probable that the effect of jail on any criminal is seldom "therapeutic" in this sense, and in any case the medical authorities relied on so heavily by appellant themselves stress that no generally effective method of curing alcoholics has yet been discovered.

Apart from the value of jail as a form of treatment, jail serves other traditional functions of the criminal law. For one thing, it gets the alcoholics off the street, where they may cause harm in a number of ways to a number of people, and isolation of the dangerous has always been considered an important function of the criminal law. In addition, punishment of chronic alcoholics can serve several deterrent functions—it can give potential alcoholics an additional incentive to control their drinking, and it may, even in the case of the chronic alcoholic, strengthen his incentive to control the frequency and location of his drinking experiences.

These values served by criminal punishment assume even greater significance in light of the available alternatives for dealing with the problem of alcoholism. Civil commitment facilities may not be any better than the jails they would replace. In addition, compulsory commitment can hardly be considered a less severe penalty from the alcoholic's point of view. The commitment period will presumably be at least as long, and it might in fact be longer since commitment often lasts until the "sick" person is cured. And compulsory commitment would of course carry with it a social stigma little different in practice from that associated with drunkenness when it is labeled a "crime."

Even the medical authorities stress the need for continued experimentation with a variety of approaches. I cannot say that the States should be totally barred from

one avenue of experimentation, the criminal process, in attempting to find a means to cope with this difficult social problem. From what I have been able to learn about the subject, it seems to me that the present use of criminal sanctions might possibly be unwise, but I am by no means convinced that *any* use of criminal sanctions would inevitably be unwise or, above all, that I am qualified in this area to know what is legislatively wise and what is legislatively unwise.

## II.

I agree with MR. JUSTICE MARSHALL that the findings of fact in this case are inadequate to justify the sweeping constitutional rule urged upon us. I could not, however, consider any findings that could be made with respect to "voluntariness" or "compulsion" controlling on the question whether a specific instance of human behavior should be immune from punishment as a constitutional matter. When we say that appellant's appearance in public is caused not by "his own" volition but rather by some other force, we are clearly thinking of a force that is nevertheless "his" except in some special sense.[1] The accused undoubtedly commits the proscribed act and the only question is whether the act can be attributed to a part of "his" personality that should not be regarded as criminally responsible. Almost all of the traditional purposes of the criminal law can be significantly served by punishing the person who in fact committed the proscribed act, without regard to whether his action was "compelled" by some elusive "irresponsible" aspect of his personality. As I have already indicated, punishment of such a defendant can clearly be justified

---

[1] If an intoxicated person is actually carried into the street by someone else, "he" does not do the act at all, and of course he is entitled to acquittal. *E. g., Martin v. State,* 31 Ala. App. 334, 17 So. 2d 427 (1944).

in terms of deterrence, isolation, and treatment. On the other hand, medical decisions concerning the use of a term such as "disease" or "volition," based as they are on the clinical problems of diagnosis and treatment, bear no necessary correspondence to the legal decision whether the overall objectives of the criminal law can be furthered by imposing punishment. For these reasons, much as I think that criminal sanctions should in many situations be applied only to those whose conduct is morally blameworthy, see *Morissette* v. *United States*, 342 U. S. 246 (1952), I cannot think the States should be held constitutionally required to make the inquiry as to what part of a defendant's personality is responsible for his actions and to excuse anyone whose action was, in some complex, psychological sense, the result of a "compulsion." [2]

### III.

The rule of constitutional law urged by appellant is not required by *Robinson* v. *California*, 370 U. S. 660 (1962). In that case we held that a person could not be punished for the mere status of being a narcotics

---

[2] The need for a cautious and tentative approach has been thoroughly recognized by one of the most active workers for reform in this area, Chief Judge Bazelon of the United States Court of Appeals for the District of Columbia Circuit. In a recent decision limiting the scope of psychiatric testimony in insanity defense cases, Judge Bazelon states:

"[I]t may be that psychiatry and the other social and behavioral sciences cannot provide sufficient data relevant to a determination of criminal responsibility no matter what our rules of evidence are. If so, we may be forced to eliminate the insanity defense altogether, or refashion it in a way which is not tied so tightly to the medical model. . . . But at least we will be able to make that decision on the basis of an informed experience. For now the writer is content to join the court in this first step." *Washington* v. *United States*, —— U. S. App. D. C. ——, ——, n. 33, 390 F. 2d 444, 457, n. 33 (1967) (expressing the views of Chief Judge Bazelon).

addict. We explicitly limited our holding to the situation where no conduct of any kind is involved, stating:

> "We hold that a state law which imprisons a person thus afflicted as a criminal, *even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there,* inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment." 370 U. S., at 667. (Emphasis added.)

The argument is made that appellant comes within the terms of our holding in *Robinson* because being drunk in public is a mere status or "condition." Despite this many-faceted use of the concept of "condition," this argument would require converting *Robinson* into a case protecting actual behavior, a step we explicitly refused to take in that decision.

A different question, I admit, is whether our attempt in *Robinson* to limit our holding to pure status crimes, involving no conduct whatever, was a sound one. I believe it was. Although some of our objections to the statute in *Robinson* are equally applicable to statutes that punish conduct "symptomatic" of a disease, any attempt to explain *Robinson* as based solely on the lack of voluntariness encounters a number of logical difficulties.[3] Other problems raised by status crimes are in no way involved when the State attempts to punish for conduct, and these other problems were, in my view, the controlling aspects of our decision.

---

[3] Although we noted in *Robinson,* 370 U. S., at 667, that narcotics addiction apparently is an illness that can be contracted innocently or involuntarily, we barred punishment for addiction even when it could be proved that the defendant had voluntarily become addicted. And we compared addiction to the status of having a common cold, a condition that most people can either avoid or quickly cure when it is important enough for them to do so.

Punishment for a status is particularly obnoxious, and in many instances can reasonably be called cruel and unusual, because it involves punishment for a mere propensity, a desire to commit an offense; the mental element is not simply one part of the crime but may constitute all of it. This is a situation universally sought to be avoided in our criminal law; the fundamental requirement that some action be proved is solidly established even for offenses most heavily based on propensity, such as attempt, conspiracy, and recidivist crimes.[4] In fact, one eminent authority has found only one isolated instance, in all of Anglo-American jurisprudence, in which criminal responsibility was imposed in the absence of any act at all.[5]

The reasons for this refusal to permit conviction without proof of an act are difficult to spell out, but they are nonetheless perceived and universally expressed in our criminal law. Evidence of propensity can be considered relatively unreliable and more difficult for a defendant to rebut; the requirement of a specific act thus provides some protection against false charges. See 4 Blackstone, Commentaries 21. Perhaps more fundamental is the difficulty of distinguishing, in the absence of any conduct, between desires of the day-dream variety and fixed intentions that may pose a real threat to society; extending the criminal law to cover both types of desire would be unthinkable, since "[t]here can hardly be anyone who has never thought evil. When a desire is inhib-

---

[4] As Glanville Williams puts it, "[t]hat crime requires an act is *invariably* true if the proposition be read as meaning that a private thought is not sufficient to found responsibility." Williams, Criminal Law—the General Part 1 (1961). (Emphasis added.) For the requirement of some act as an element of conspiracy and attempt, see *id.*, at 631, 663, 668; R. Perkins, Criminal Law 482, 531–532 (1957).

[5] Williams, *supra,* n. 4, at 11.

ited it may find expression in fantasy; but it would be absurd to condemn this natural psychological mechanism as illegal." [6]

In contrast, crimes that require the State to prove that the defendant actually committed some proscribed act involve none of these special problems. In addition, the question whether an act is "involuntary" is, as I have already indicated, an inherently elusive question, and one which the State may, for good reasons, wish to regard as irrelevant. In light of all these considerations, our limitation of our *Robinson* holding to pure status crimes seems to me entirely proper.

## IV.

The rule of constitutional law urged upon us by appellant would have a revolutionary impact on the criminal law, and any possible limits proposed for the rule would be wholly illusory. If the original boundaries of *Robinson* are to be discarded, any new limits too would soon fall by the wayside and the Court would be forced to hold the States powerless to punish any conduct that could be shown to result from a "compulsion," in the complex, psychological meaning of that term. The result, to choose just one illustration, would be to require recognition of "irresistible impulse" as a complete defense to any crime; this is probably contrary to present law in most American jurisdictions.[7]

The real reach of any such decision, however, would be broader still, for the basic premise underlying the argument is that it is cruel and unusual to punish a person who is not morally blameworthy. I state the proposition in this sympathetic way because I feel there is much to be said for avoiding the use of criminal sanctions in many

---

[6] *Id.*, at 2.

[7] Perkins, *supra*, n. 4, at 762.

such situations.   See *Morissette* v. *United States, supra.*
But the question here is one of constitutional law.   The
legislatures have always been allowed wide freedom to
determine the extent to which moral culpability should
be a prerequisite to conviction of a crime.   *E. g., United
States* v. *Dotterweich,* 320 U. S. 277 (1943).   The crimi-
nal law is a social tool that is employed in seeking a wide
variety of goals, and I cannot say the Eighth Amend-
ment's limits on the use of criminal sanctions extend as
far as this viewpoint would inevitably carry them.

But even if we were to limit any holding in this field
to "compulsions" that are "symptomatic" of a "disease,"
in the words of the findings of the trial court, the sweep
of that holding would still be startling.   Such a ruling
would make it clear beyond any doubt that a narcotics
addict could not be punished for "being" in possession
of drugs or, for that matter, for "being" guilty of using
them.   A wide variety of sex offenders would be immune
from punishment if they could show that their conduct
was not voluntary but part of the pattern of a disease.
More generally speaking, a form of the insanity defense
would be made a constitutional requirement throughout
the Nation, should the Court now hold it cruel and
unusual to punish a person afflicted with any mental
disease whenever his conduct was part of the pattern of
his disease and occasioned by a compulsion symptomatic
of the disease.   Such a holding would appear to over-
rule *Leland* v. *Oregon,* 343 U. S. 790 (1952), where the
majority opinion and the dissenting opinion in which
I joined both stressed the indefensibility of imposing
on the States any particular test of criminal responsi-
bility.   *Id.,* at 800–801; *id.,* at 803 (Frankfurter, J.,
dissenting).

The impact of the holding urged upon us would, of
course, be greatest in those States which have until now

refused to accept any qualifications to the "right from wrong" test of insanity; apparently at least 30 States fall into this category.[8]  But even in States which have recognized insanity defenses similar to the proposed new constitutional rule, or where comparable defenses could be presented in terms of the requirement of a guilty mind (*mens rea*), the proposed new constitutional rule would be devastating, for constitutional questions would be raised by every state effort to regulate the admissibility of evidence relating to "disease" and "compulsion," and by every state attempt to explain these concepts in instructions to the jury.  The test urged would make it necessary to determine, not only what constitutes a "disease," but also what is the "pattern" of the disease, what "conditions" are "part" of the pattern, what parts of this pattern result from a "compulsion," and finally which of these compulsions are "symptomatic" of the disease.  The resulting confusion and uncertainty could easily surpass that experienced by the District of Columbia Circuit in attempting to give content to its similar, though somewhat less complicated, test of insanity.[9] The range of problems created would seem totally beyond our capacity to settle at all, much less to settle wisely, and even the attempt to define these terms and thus to impose constitutional and doctrinal rigidity seems absurd in an area where our understanding is even today so incomplete.

---

[8] See Model Penal Code § 4.01, at 160 (Tent. Draft No. 4, 1955).

[9] *Durham* v. *United States,* 94 U. S. App. D. C. 228, 214 F. 2d 862 (1954).  Some of the enormous difficulties encountered by the District of Columbia Circuit in attempting to apply its *Durham* rule are related in H. R. Rep. No. 563, 87th Cong., 1st Sess. (1961).  The difficulties and shortcomings of the *Durham* rule have been fully acknowledged by the District of Columbia Circuit itself, and in particular by the author of the *Durham* opinion.  See *Washington* v. *United States, supra.*

## V.

Perceptive students of history at an early date learned that one country controlling another could do a more successful job if it permitted the latter to keep in force the laws and rules of conduct which it had adopted for itself. When our Nation was created by the Constitution of 1789, many people feared that the 13 straggling, struggling States along the Atlantic composed too great an area ever to be controlled from one central point. As the years went on, however, the Nation crept cautiously westward until it reached the Pacific Ocean and finally the Nation planted its flag on the far-distant Islands of Hawaii and on the frozen peaks of Alaska. During all this period the Nation remembered that it could be more tranquil and orderly if it functioned on the principle that the local communities should control their own peculiarly local affairs under their own local rules.

This Court is urged to forget that lesson today. We are asked to tell the most-distant Islands of Hawaii that they cannot apply their local rules so as to protect a drunken man on their beaches and the local communities of Alaska that they are without power to follow their own course in deciding what is the best way to take care of a drunken man on their frozen soil. This Court, instead of recognizing that the experience of human beings is the best way to make laws, is asked to set itself up as a board of Platonic Guardians to establish rigid, binding rules upon every small community in this large Nation for the control of the unfortunate people who fall victim to drunkenness. It is always time to say that this Nation is too large, too complex and composed of too great a diversity of peoples for any one of us to have the wisdom to establish the rules by which local Americans must govern their local affairs. The constitutional rule we are urged to adopt is not merely revolutionary—

it departs from the ancient faith based on the premise that experience in making local laws by local people themselves is by far the safest guide for a nation like ours to follow. I suspect this is a most propitious time to remember the words of the late Judge Learned Hand, who so wisely said:

> "For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not." L. Hand, The Bill of Rights 73 (1958).

I would confess the limits of my own ability to answer the age-old questions of the criminal law's ethical foundations and practical effectiveness. I would hold that *Robinson* v. *California* establishes a firm and impenetrable barrier to the punishment of persons who, whatever their bare desires and propensities, have committed no proscribed wrongful act. But I would refuse to plunge from the concrete and almost universally recognized premises of *Robinson* into the murky problems raised by the insistence that chronic alcoholics cannot be punished for public drunkenness, problems that no person, whether layman or expert, can claim to understand, and with consequences that no one can safely predict. I join in affirmance of this conviction.

Mr. JUSTICE WHITE, concurring in the result.

If it cannot be a crime to have an irresistible compulsion to use narcotics, *Robinson* v. *California,* 370 U. S. 660, rehearing denied, 371 U. S. 905 (1962), I do not see how it can constitutionally be a crime to yield to such a compulsion. Punishing an addict for using drugs convicts for addiction under a different name. Distinguishing between the two crimes is like forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion. Unless *Robinson* is to be abandoned, the use of narcotics by an

addict must be beyond the reach of the criminal law. Similarly, the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk.

Powell's conviction was for the different crime of being drunk in a public place. Thus even if Powell was compelled to drink, and so could not constitutionally be convicted for drinking, his conviction in this case can be invalidated only if there is a constitutional basis for saying that he may not be punished for being in public while drunk. The statute involved here, which aims at keeping drunks off the street for their own welfare and that of others, is not challenged on the ground that it interferes unconstitutionally with the right to frequent public places. No question is raised about applying this statute to the nonchronic drunk, who has no compulsion to drink, who need not drink to excess, and who could have arranged to do his drinking in private or, if he began drinking in public, could have removed himself at an appropriate point on the path toward complete inebriation.

The trial court said that Powell was a chronic alcoholic with a compulsion not only to drink to excess but also to frequent public places when intoxicated. Nothing in the record before the trial court supports the latter conclusion, which is contrary to common sense and to common knowledge.[1] The sober chronic alcoholic has no

---

[1] The trial court gave no reasons for its conclusion that Powell appeared in public due to "a compulsion symptomatic of the disease of chronic alcoholism." No facts in the record support that conclusion. The trial transcript strongly suggests that the trial judge merely adopted proposed findings put before him by Powell's counsel. The fact that those findings were of no legal relevance in the trial judge's view of the case is very significant for appraising the extent to which they represented a well-considered and well-supported judgment. For all these reasons I do not feel impelled to accept this finding, and certainly would not rest a constitutional adjudication upon it.

compulsion to be on the public streets; many chronic alcoholics drink at home and are never seen drunk in public. Before and after taking the first drink, and until he becomes so drunk that he loses the power to know where he is or to direct his movements, the chronic alcoholic with a home or financial resources is as capable as the nonchronic drinker of doing his drinking in private, of removing himself from public places and, since he knows or ought to know that he will become intoxicated, of making plans to avoid his being found drunk in public. For these reasons, I cannot say that the chronic alcoholic who proves his disease and a compulsion to drink is shielded from conviction when he has knowingly failed to take feasible precautions against committing a criminal act, here the act of going to or remaining in a public place. On such facts the alcoholic is like a person with smallpox, who could be convicted for being on the street but not for being ill, or, like the epileptic, who could be punished for driving a car but not for his disease.[2]

---

[2] Analysis of this difficult case is not advanced by preoccupation with the label "condition." In *Robinson* the Court dealt with "a statute which makes the 'status' of narcotic addiction a criminal offense . . . ." 370 U. S., at 666. By precluding criminal conviction for such a "status" the Court was dealing with a condition brought about by acts remote in time from the application of the criminal sanctions contemplated, a condition which was relatively permanent in duration, and a condition of great magnitude and significance in terms of human behavior and values. Although the same may be said for the "condition" of being a chronic alcoholic, it cannot be said for the mere transitory state of "being drunk in public." "Being" drunk in public is not far removed in time from the acts of "getting" drunk and "going" into public, and it is not necessarily a state of any great duration. And, an isolated instance of "being" drunk in public is of relatively slight importance in the life of an individual as compared with the condition of being a chronic alcoholic. If it were necessary to distinguish between "acts" and "conditions" for purposes of the Eighth Amendment, I would adhere to the concept of "condition" implicit

The fact remains that some chronic alcoholics must drink and hence must drink *somewhere*.[3] Although many chronics have homes, many others do not. For all practical purposes the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking. This is more a function of economic station than of disease, although the disease may lead to destitution and perpetuate that condition. For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment—the act of getting drunk.

It is also possible that the chronic alcoholic who begins drinking in private at some point becomes so drunk that

---

in the opinion in *Robinson;* I would not trivialize that concept by drawing a nonexistent line between the man who appears in public drunk and that same man five minutes later who is then "being" drunk in public. The proper subject of inquiry is whether volitional acts brought about the "condition" and whether those acts are sufficiently proximate to the "condition" for it to be permissible to impose penal sanctions on the "condition."

[3] The opinion of MR. JUSTICE MARSHALL makes clear the limitations of our present knowledge of alcoholism and the disagreements among doctors in their description and analysis of the disease. It is also true that on the record before us there is some question whether Powell possessed that degree of compulsion which alone would satisfy one of the prerequisites I deem essential to assertion of an Eighth Amendment defense. It is nowhere disputed, however, that there are chronic alcoholics whose need to consume alcohol in large quantities is so persistent and so insistent that they are truly compelled to drink. I find it unnecessary to attempt on this record to determine whether or not Powell is such an alcoholic, for in my view his attempt to claim the Eighth Amendment fails for other reasons.

he loses the power to control his movements and for that reason appears in public. The Eighth Amendment might also forbid conviction in such circumstances, but only on a record satisfactorily showing that it was not feasible for him to have made arrangements to prevent his being in public when drunk and that his extreme drunkenness sufficiently deprived him of his faculties on the occasion in issue.

These prerequisites to the possible invocation of the Eighth Amendment are not satisfied on the record before us.[4] Whether or not Powell established that he could

_____

[4] A holding that a person establishing the requisite facts could not, because of the Eighth Amendment, be criminally punished for appearing in public while drunk would be a novel construction of that Amendment, but it would hardly have radical consequences. In the first place, when as here the crime charged was being drunk in a public place, only the compulsive chronic alcoholic would have a defense to both elements of the crime—for his drunkenness because his disease compelled him to drink and for being in a public place because the force of circumstances or excessive intoxication sufficiently deprived him of his mental and physical powers. The drinker who was not compelled to drink, on the other hand, although he might be as poorly circumstanced, equally intoxicated, and equally without his physical powers and cognitive faculties, could have avoided drinking in the first place, could have avoided drinking to excess, and need not have lost the power to manage his movements. Perhaps the heavily intoxicated, compulsive alcoholic who could not have arranged to avoid being in public places may not, consistent with the Eighth Amendment, be convicted for being drunk in a public place. However, it does not necessarily follow that it would be unconstitutional to convict him for committing crimes involving much greater risk to society.

Outside the area of alcoholism such a holding would not have a wide impact. Concerning drugs, such a construction of the Eighth Amendment would bar conviction only where the drug is addictive and then only for acts which are a necessary part of addiction, such as simple use. Beyond that it would preclude punishment only when the addiction to or the use of drugs caused sufficient loss of physical and mental faculties. This doctrine would not bar con-

not have resisted becoming drunk on December 19, 1966, nothing in the record indicates that he could not have done his drinking in private or that he was so inebriated at the time that he had lost control of his movements and wandered into the public street. Indeed, the evidence in the record strongly suggests that Powell could have drunk at home and made plans while sober to prevent ending up in a public place. Powell had a home and wife, and if there were reasons why he had to drink in public or be drunk there, they do not appear in the record.

Also, the only evidence bearing on Powell's condition at the time of his arrest was the testimony of the arresting officer that appellant staggered, smelled of alcohol, and was "very drunk." Powell testified that he had no clear recollection of the situation at the time of his arrest. His testimony about his usual condition when drunk is no substitute for evidence about his condition at the time of his arrest. Neither in the medical testimony nor elsewhere is there any indication that Powell had reached such a state of intoxication that he had lost the ability to comprehend what he was doing or where he was. For all we know from this record, Powell at the time knew precisely where he was, retained the power to stay off or leave the streets, and simply preferred to be there rather than elsewhere.

It is unnecessary to pursue at this point the further definition of the circumstances or the state of intoxication which might bar conviction of a chronic alcoholic for being drunk in a public place. For the purposes of this case, it is necessary to say only that Powell showed nothing more than that he was to some degree compelled

---

viction of a heroin addict for being under the influence of heroin in a public place (although other constitutional concepts might be relevant to such a conviction), or for committing other criminal acts.

to drink and that he was drunk at the time of his arrest. He made no showing that he was unable to stay off the streets on the night in question.[5]

Because Powell did not show that his conviction offended the Constitution, I concur in the judgment affirming the Travis County court.

MR. JUSTICE FORTAS, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE STEWART join, dissenting.

Appellant was charged with being found in a state of intoxication in a public place. This is a violation of Article 477 of the Texas Penal Code, which reads as follows:

> "Whoever shall get drunk or be found in a state of intoxication in any public place, or at any private house except his own, shall be fined not exceeding one hundred dollars."

Appellant was tried in the Corporation Court of Austin, Texas. He was found guilty and fined $20. He appealed to the County Court at Law No. 1 of Travis County, Texas, where a trial *de novo* was held. Appellant was defended by counsel who urged that appellant was "afflicted with the disease of chronic alcoholism which has destroyed the power of his will to resist the constant, excessive consumption of alcohol; his appear-

---

[5] I do not question the power of the State to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regained his powers. The person's own safety and the public interest require this much. A statute such as the one challenged in this case is constitutional insofar as it authorizes a police officer to arrest any seriously intoxicated person when he is encountered in a public place. Whether such a person may be charged and convicted for violating the statute will depend upon whether he is entitled to the protection of the Eighth Amendment.

ance in public in that condition is not of his own volition, but a compulsion symptomatic of the disease of chronic alcoholism." Counsel contended that to penalize appellant for public intoxication would be to inflict upon him cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

At the trial in the county court, the arresting officer testified that he had observed appellant in the 2000 block of Hamilton Street in Austin; that appellant staggered when he walked; that his speech was slurred; and that he smelled strongly of alcohol. He was not loud or boisterous; he did not resist arrest; he was cooperative with the officer.

The defense established that appellant had been convicted of public intoxication approximately 100 times since 1949, primarily in Travis County, Texas. The circumstances were always the same: the "subject smelled strongly of alcoholic beverages, staggered when walking, speech incoherent." At the end of the proceedings, he would be fined: "down in Bastrop County, it's $25.00 down there, and it's $20.00 up here [in Travis County]." Appellant was usually unable to pay the fines imposed for these offenses, and therefore usually has been obliged to work the fines off in jail. The statutory rate for working off such fines in Texas is one day in jail for each $5 of fine unpaid. Texas Code Crim. Proc., Art. 43.09.

Appellant took the stand. He testified that he works at a tavern shining shoes. He makes about $12 a week which he uses to buy wine. He has a family, but he does not contribute to its support. He drinks wine every day. He gets drunk about once a week. When he gets drunk, he usually goes to sleep, "mostly" in public places such as the sidewalk. He does not disturb the peace or interfere with others.

The defense called as a witness Dr. David Wade, a Fellow of the American Medical Association and a former President of the Texas Medical Association. Dr. Wade is a qualified doctor of medicine, duly certificated in psychiatry. He has been engaged in the practice of psychiatry for more than 20 years. During all of that time he has been especially interested in the problem of alcoholism. He has treated alcoholics; lectured and written on the subject; and has observed the work of various institutions in treating alcoholism. Dr. Wade testified that he had observed and interviewed the appellant. He said that appellant has a history of excessive drinking dating back to his early years; that appellant drinks only wine and beer; that "he rarely passes a week without going on an alcoholic binge"; that "his consumption of alcohol is limited only by his finances, and when he is broke, he makes an effort to secure alcohol by getting his friends to buy alcohol for him"; that he buys a "fifty cent bottle" of wine, always with the thought that this is all he will drink; but that he ends by drinking all he can buy until he "is . . . passed out in some joint or out on the sidewalk." According to Dr. Wade, appellant "has never engaged in any activity that is destructive to society or to anyone except himself." He has never received medical or psychiatric treatment for his drinking problem. He has never been referred to Alcoholics Anonymous, a voluntary association for helping alcoholics, nor has he ever been sent to the State Hospital.

Dr. Wade's conclusion was that "Leroy Powell is an alcoholic and that his alcoholism is in a chronic stage." Although the doctor responded affirmatively to a question as to whether the appellant's taking the first drink on any given occasion is "a voluntary exercise of will," his testimony was that "we must take into account" the fact that chronic alcoholics have a "compulsion" to drink which "while not completely overpowering, is a

very strong influence, an exceedingly strong influence," and that this compulsion is coupled with the "firm belief in their mind that they are going to be able to handle it from now on." It was also Dr. Wade's opinion that appellant "has an uncontrollable compulsion to drink" and that he "does not have the willpower [to resist the constant excessive consumption of alcohol or to avoid appearing in public when intoxicated] nor has he been given medical treatment to enable him to develop this willpower."

The trial judge in the county court, sitting without a jury, made the following findings of fact:

"(1) That chronic alcoholism is a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol.

"(2) That a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism.

"(3) That Leroy Powell, defendant herein, is a chronic alcoholic who is afflicted with the disease of chronic alcoholism." [1]

---

[1] I do not understand the relevance of our knowing "very little about the circumstances surrounding the drinking bout which resulted in this conviction, or about Leroy Powell's drinking problem." (Opinion of MARSHALL, J., *ante*, at 521–522). We do not "traditionally" sit as a trial court, much less as a finder of fact. I submit that we must accept the findings of the trial court as they were made and not as the members of this Court would have made them had they sat as triers of fact. I would add, lest I create a misunderstanding, that I do not suggest in this opinion that Leroy Powell had a constitutional right, based upon the evidence adduced at his trial, to the findings of fact that were made by the county court; only that once such findings were in fact made, it became the duty of the trial court to apply the relevant legal principles and to declare that appellant's conviction would be constitutionally invalid. See *infra*, at 567–570.

I confess, too, that I do not understand the relevance of our knowing very little "about alcoholism itself," given what we do

The court then rejected appellant's constitutional defense, entering the following conclusion of law:

> "(1) The fact that a person is a chronic alcoholic afflicted with the disease of chronic alcoholism, is not a defense to being charged with the offense of getting drunk or being found in a state of intoxication in any public place under Art. 477 of the Texas Penal Code."

The court found appellant guilty as charged and increased his fine to $50. Appellant did not have the right to appeal further within the Texas judicial system. Tex. Code Crim. Proc., Art. 4.03. He filed a jurisdictional statement in this Court.

### I.

The issue posed in this case is a narrow one. There is no challenge here to the validity of public intoxication statutes in general or to the Texas public intoxication statute in particular. This case does not concern the infliction of punishment upon the "social" drinker—or upon anyone other than a "chronic alcoholic" who, as the trier of fact here found, cannot "resist the constant, excessive consumption of alcohol." Nor does it relate to any offense other than the crime of public intoxication.

The sole question presented is whether a criminal penalty may be imposed upon a person suffering the disease of "chronic alcoholism" for a condition—being "in a state of intoxication" in public—which is a characteristic part of the pattern of his disease and which, the trial court found, was not the consequence of appellant's volition but of "a compulsion symptomatic of the disease of chronic alcoholism." We must consider whether the Eighth Amendment, made applicable to the States through the

know—that findings such as those made in this case are, in the view of competent medical authorities, perfectly plausible. See *infra,* at 560–562.

Fourteenth Amendment, prohibits the imposition of this penalty in these rather special circumstances as "cruel and unusual punishment." This case does not raise any question as to the right of the police to stop and detain those who are intoxicated in public, whether as a result of the disease or otherwise; or as to the State's power to commit chronic alcoholics for treatment. Nor does it concern the responsibility of an alcoholic for criminal *acts.* We deal here with the mere *condition* of being intoxicated in public.[2]

## II.

As I shall discuss, consideration of the Eighth Amendment issue in this case requires an understanding of "the disease of chronic alcoholism" with which, as the trial court found, appellant is afflicted, which has destroyed his "will power to resist the constant, excessive consumption of alcohol," and which leads him to "appear in public [not] by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism." It is true, of course, that there is a great deal that remains to be discovered about chronic alcoholism. Although many aspects of the disease remain obscure, there are some hard facts—medical and, especially, legal facts—that are accessible to us and that provide a context in which the instant case may be analyzed. We are similarly woefully deficient in our medical, diagnostic, and therapeutic

---

[2] It is not foreseeable that findings such as those which are decisive here—namely that the appellant's being intoxicated in public was a part of the pattern of his disease and due to a compulsion symptomatic of that disease—could or would be made in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery. Such offenses require independent acts or conduct and do not typically flow from and are not part of the syndrome of the disease of chronic alcoholism. If an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment.

knowledge of mental disease and the problem of insanity; but few would urge that, because of this, we should totally reject the legal significance of what we do know about these phenomena.

Alcoholism [3] is a major problem in the United States.[4] In 1956 the American Medical Association for the first time designated alcoholism as a major medical problem and urged that alcoholics be admitted to general hospitals for care.[5] This significant development marked the acceptance among the medical profession of the "disease concept of alcoholism." [6] Although there is some prob-

---

[3] The term has been variously defined. The National Council on Alcoholism has defined "alcoholic" as "a person who is powerless to stop drinking and whose drinking seriously alters his normal living pattern." The American Medical Association has defined alcoholics as "those excessive drinkers whose dependence on alcohol has attained such a degree that it shows a noticeable disturbance or interference with their bodily or mental health, their interpersonal relations, and their satisfactory social and economic functioning."

For other common definitions of alcoholism, see Keller, Alcoholism: Nature and Extent of the Problem, in Understanding Alcoholism, 315 Annals 1, 2 (1958); O. Diethelm, Etiology of Chronic Alcoholism 4 (1955); T. Plaut, Alcohol Problems—A Report to the Nation by the Cooperative Commission on the Study of Alcoholism 39 (1967) (hereafter cited as Plaut); Aspects of Alcoholism 9 (1963) (published by Roche Laboratories); The Treatment of Alcoholism—A Study of Programs and Problems 8 (1967) (published by the Joint Information Service of the American Psychiatric Association and the National Association for Mental Health) (hereafter cited as The Treatment of Alcoholism); 2 R. Cecil & R. Loeb, A Textbook of Medicine 1620, 1625 (1959).

[4] It ranks among the top four public health problems of the country. M. Block, Alcoholism—Its Facets and Phases (1962).

[5] American Medical Association: Report of Reference Committee on Medical Education and Hospitals, Proceedings of the House of Delegates, Seattle, Wash., Nov. 27–29, 1956, p. 33; 163 J. A. M. A. 52 (1957).

[6] See generally E. Jellinek, The Disease Concept of Alcoholism (1960).

lem in defining the concept, its core meaning, as agreed by authorities, is that alcoholism is caused and maintained by something other than the moral fault of the alcoholic, something that, to a greater or lesser extent depending upon the physiological or psychological make-up and history of the individual, cannot be controlled by him. Today most alcohologists and qualified members of the medical profession recognize the validity of this concept. Recent years have seen an intensification of medical interest in the subject.[7] Medical groups have become active in educating the public, medical schools, and physicians in the etiology, diagnosis, and treatment of alcoholism.[8]

Authorities have recognized that a number of factors may contribute to alcoholism. Some studies have pointed to physiological influences, such as vitamin deficiency, hormone imbalance, abnormal metabolism, and hereditary proclivity. Other researchers have found more convincing a psychological approach, emphasizing early environment and underlying conflicts and tensions. Numerous studies have indicated the influence of sociocultural factors. It has been shown, for example, that the incidence of alcoholism among certain ethnic groups is far higher than among others.[9]

---

[7] See, e. g., H. Haggard & E. Jellinek, Alcohol Explored (1942); O. Diethelm, Etiology of Chronic Alcoholism (1955); A. Ullman, To Know the Difference (1960); D. Pittman & C. Snyder, Society, Culture, and Drinking Patterns (1962).

[8] See Alcoholism, Public Intoxication and the Law, 2 Col. J. Law & Soc. Prob. 109, 113 (1966).

[9] See Alcohol and Alcoholism 24–28 (published by the Public Health Service of the U. S. Department of Health, Education, and Welfare). "Although many interesting pieces of evidence have been assembled, it is not yet known why a small percentage of those who use alcohol develop a destructive affinity for it." The Treatment of Alcoholism 9.

The manifestations of alcoholism are reasonably well identified. The late E. M. Jellinek, an eminent alcohologist, has described five discrete types commonly found among American alcoholics.[10] It is well established that alcohol may be habituative and "can be physically addicting."[11] It has been said that "the main point for the nonprofessional is that alcoholism is not within the control of the person involved. He is not willfully drinking."[12]

Although the treatment of alcoholics has been successful in many cases,[13] physicians have been unable to discover any single treatment method that will invariably produce satisfactory results. A recent study of available treatment facilities concludes as follows:[14]

> "Although numerous kinds of therapy and intervention appear to have been effective with various kinds of problem drinkers, the process of matching patient and treatment method is not yet highly developed. There is an urgent need for continued experimentation, for modifying and improving exist-

---

[10] See E. Jellinek, The Disease Concept of Alcoholism 35–41 (1960).

[11] Alcoholism 3 (1963) (published by the Public Health Service of the U. S. Department of Health, Education, and Welfare). See also Bacon, Alcoholics Do Not Drink, in Understanding Alcoholism, 315 Annals 55–64 (1958).

[12] A. Ullman, To Know the Difference 22 (1960).

[13] In response to the question "can a chronic alcoholic be medically treated and returned to society as a useful citizen?" Dr. Wade testified as follows:

"We believe that it is possible to treat alcoholics, and we have large numbers of individuals who are now former alcoholics. They themselves would rather say that their condition has been arrested and that they remain alcoholics, that they are simply living a pattern of life, through the help of medicine or whatever source, that enables them to refrain from drinking and enables them to combat the compulsion to drink."

[14] The Treatment of Alcoholism 13.

ing treatment methods, for developing new ones, and for careful and well-designed evaluative studies. Most of the facilities that provide services for alcoholics have made little, if any, attempt to determine the effectiveness of the total program or of its components."

Present services for alcoholics include state and general hospitals, separate state alcoholism programs, outpatient clinics, community health centers, general practitioners, and private psychiatric facilities.[15] Self-help organizations, such as Alcoholics Anonymous, also aid in treatment and rehabilitation.[16]

The consequences of treating alcoholics, under the public intoxication laws, as criminals can be identified with more specificity. Public drunkenness is punished as a crime, under a variety of laws and ordinances, in every State of the Union.[17] The Task Force on Drunkenness of the President's Commission on Law Enforcement and Administration of Justice has reported that "[t]wo million arrests in 1965—one of every three arrests in America— were for the offense of public drunkenness." [18] Drunkenness offenders make up a large percentage of the population in short-term penal institutions.[19] Their arrest and processing place a tremendous burden upon the police, who are called upon to spend a large amount of time

---

[15] *Id.*, at 13–26. See also Alcohol and Alcoholism 31–40; Plaut 53–85.

[16] See A. Ullman, To Know the Difference 173–191 (1960).

[17] For the most part these laws and ordinances, like Article 477 of the Texas Penal Code, cover the offense of being drunk in a public place. See Task Force Report: Drunkenness 1 (1967) (published by The President's Commission on Law Enforcement and Administration of Justice) (hereafter cited as Task Force Report).

[18] *Ibid.*

[19] See Alcoholism, Public Intoxication and the Law, 2 Col. J. Law & Soc. Prob. 109, 110 (1966).

in arresting for public intoxication and in appearing at trials for public intoxication, and upon the entire criminal process.[20]

It is not known how many drunkenness offenders are chronic alcoholics, but "[t]here is strong evidence . . . that a large number of those who are arrested have a lengthy history of prior drunkenness arrests."[21]  "There are instances of the same person being arrested as many as forty times in a single year on charges of drunkenness, and every large urban center can point to cases of individuals appearing before the courts on such charges 125, 150, or even 200 times in the course of a somewhat longer period."[22]

It is entirely clear that the jailing of chronic alcoholics is punishment.  It is not defended as therapeutic, nor is there any basis for claiming that it is therapeutic (or indeed a deterrent).  The alcoholic offender is caught in a "revolving door"—leading from arrest on the street through a brief, unprofitable sojourn in jail, back to the street and, eventually, another arrest.[23]  The jails, over-crowded and put to a use for which they are not suit-

---

[20] See Task Force Report 3–4.

[21] *Id.*, at 1.

[22] F. Allen, The Borderland of Criminal Justice 8 (1964).  It does not, of course, necessarily follow from the frequency of his arrests that a person is a chronic alcoholic.

[23] See D. Pittman & C. Gordon, Revolving Door: A Study of the Chronic Police Case Inebriate (1958).  See also Pittman, Public Intoxication and the Alcoholic Offender in American Society, Appendix A to Task Force Report.

Dr. Wade answered each time in the negative when asked:

"Is a chronic alcoholic going to be rehabilitated by simply confining him in jail without medical attention?

"Would putting a chronic alcoholic in jail operate to lessen his desire for alcohol when he is released?

"Would imposing a monetary fine on a chronic alcoholic operate to lessen his desire for alcohol?"

able, have a destructive effect upon alcoholic inmates.[24]

Finally, most commentators, as well as experienced judges,[25] are in agreement that "there is probably no drearier example of the futility of using penal sanctions to solve a psychiatric problem than the enforcement of the laws against drunkenness." [26]

> "If all of this effort, all of this investment of time and money, were producing constructive results, then we might find satisfaction in the situation despite its costs.  But the fact is that this activity accomplishes little that is fundamental.  No one can seriously suggest that the threat of fines and jail sentences actually deters habitual drunkenness or alcoholic addiction. . . .  Nor, despite the heroic efforts being made in a few localities, is there much reason to suppose that any very effective measures of cure and therapy can or will be administered in the jails.  But the weary process continues, to the detriment of the total performance of the law-enforcement function." [27]

## III.

It bears emphasis that these data provide only a context for consideration of the instant case.  They should not dictate our conclusion.  The questions for this Court are not settled by reference to medicine or penology.  Our task is to determine whether the principles embodied in the Constitution of the United States place any limitations upon the circumstances under which punishment

[24] See, e. g., MacCormick, Correctional Views on Alcohol, Alcoholism, and Crime, 9 Crime & Delin. 15 (1963).

[25] See, e. g., Murtagh, Arrests for Public Intoxication, 35 Fordham L. Rev. 1 (1966).

[26] M. Guttmacher & H. Weihofen, Psychiatry and the Law 319 (1952).

[27] F. Allen, The Borderland of Criminal Justice 8–9 (1964).

may be inflicted, and, if so, whether, in the case now before us, those principles preclude the imposition of such punishment.

It is settled that the Federal Constitution places some substantive limitation upon the power of state legislatures to define crimes for which the imposition of punishment is ordered. In *Robinson* v. *California,* 370 U. S. 660 (1962), the Court considered a conviction under a California statute making it a criminal offense for a person to "be addicted to the use of narcotics." At Robinson's trial, it was developed that the defendant had been a user of narcotics. The trial court instructed the jury that "[t]o be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms." *Id.,* at 662–663.

This Court reversed Robinson's conviction on the ground that punishment under the law in question was cruel and unusual, in violation of the Eighth Amendment of the Constitution as applied to the States through the Fourteenth Amendment. The Court noted that narcotic addiction is considered to be an illness and that California had recognized it as such. It held that the State could not make it a crime for a person to be ill.[28] Although Robinson had been sentenced to only 90 days in prison for his offense, it was beyond the power of the State to prescribe such punishment. As MR. JUSTICE STEWART, speaking for the Court, said: "[e]ven one day

---

[28] "We would forget the teachings of the Eighth Amendment if we allowed sickness to be made a crime and permitted sick people to be punished for being sick. This age of enlightenment cannot tolerate such barbarous action." 370 U. S., at 678 (DOUGLAS, J., concurring).

in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U. S., at 667.

*Robinson* stands upon a principle which, despite its subtlety, must be simply stated and respectfully applied because it is the foundation of individual liberty and the cornerstone of the relations between a civilized state and its citizens: Criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change. In all probability, Robinson at some time before his conviction elected to take narcotics. But the crime as defined did not punish this conduct.[29] The statute imposed a penalty for the offense of "addiction"—a condition which Robinson could not control. Once Robinson had become an addict, he was utterly powerless to avoid criminal guilt. He was powerless to choose not to violate the law.

In the present case, appellant is charged with a crime composed of two elements—being intoxicated and being found in a public place while in that condition. The crime, so defined, differs from that in *Robinson*. The statute covers more than a mere status.[30] But the essen-

---

[29] The Court noted in *Robinson* that narcotic addiction "is apparently an illness which may be contracted innocently or involuntarily." *Id.*, at 667. In the case of alcoholism it is even more likely that the disease may be innocently contracted, since the drinking of alcoholic beverages is a common activity, generally accepted in our society, while the purchasing and taking of drugs are crimes. As in *Robinson*, the State has not argued here that Powell's conviction may be supported by his "voluntary" action in becoming afflicted.

[30] In *Robinson*, we distinguished between punishment for the "status" of addiction and punishment of an "act":

"This statute . . . is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status'

tial constitutional defect here is the same as in *Robinson*, for in both cases the particular defendant was accused of being in a condition which he had no capacity to change or avoid. The trial judge sitting as trier of fact found, upon the medical and other relevant testimony, that Powell is a "chronic alcoholic." He defined appellant's "chronic alcoholism" as "a disease which destroys the afflicted person's will power to resist the constant, excessive consumption of alcohol." He also found that "a chronic alcoholic does not appear in public by his own volition but under a compulsion symptomatic of the disease of chronic alcoholism." I read these findings to mean that appellant was powerless to avoid drinking; that having taken his first drink, he had "an uncontrollable compulsion to drink" to the point of intoxication; and that, once intoxicated, he could not prevent himself from appearing in public places.[31]

of narcotic addition a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there." *Id.*, at 666.

[31] I also read these findings to mean that appellant's disease is such that he cannot be deterred by Article 477 of the Texas Penal Code from drinking to excess and from appearing in public while intoxicated. See n. 23, *supra*.

Finally, contrary to the views of MR. JUSTICE WHITE, *ante*, at 549–551, I believe these findings must fairly be read to encompass the facts that my Brother WHITE agrees would require reversal, that is, that for appellant Powell, "resisting drunkenness" and "avoiding public places when intoxicated" on the occasion in question were "impossible." Accordingly, in MR. JUSTICE WHITE's words, "[the] statute is in effect a law which bans a single act for which [he] may not be convicted under the Eighth Amendment—the act of getting drunk." In my judgment, the findings amply show that "it was not feasible for [Powell] to have made arrangements to prevent his being in public when drunk and that his extreme drunkennesss sufficiently deprived him of his faculties on the occasion in issue."

Article 477 of the Texas Penal Code is specifically
directed to the accused's presence while in a state of
intoxication, "in any public place, or at any private house
except his own." This is the essence of the crime. Ordi-
narily when the State proves such presence in a state of
intoxication, this will be sufficient for conviction, and the
punishment prescribed by the State may, of course, be
validly imposed. But here the findings of the trial judge
call into play the principle that a person may not be pun-
ished if the condition essential to constitute the defined
crime is part of the pattern of his disease and is occa-
sioned by a compulsion symptomatic of the disease.
This principle, narrow in scope and applicability, is
implemented by the Eighth Amendment's prohibition
of "cruel and unusual punishment," as we construed that
command in *Robinson*. It is true that the command
of the Eighth Amendment and its antecedent provision
in the Bill of Rights of 1689 were initially directed to
the type and degree of punishment inflicted.[32] But in
*Robinson* we recognized that "the principle that would
deny power to exact capital punishment for a petty
crime would also deny power to punish a person by
fine or imprisonment for being sick." 370 U. S., at 676
(MR. JUSTICE DOUGLAS, concurring).[33]

The findings in this case, read against the background
of the medical and sociological data to which I have
referred, compel the conclusion that the infliction upon
appellant of a criminal penalty for being intoxicated in

[32] See, *e. g., Trop* v. *Dulles,* 356 U. S. 86 (1958); *Weems* v. *United
States,* 217 U. S. 349 (1910). See generally Note, The Cruel and
Unusual Punishment Clause and the Substantive Criminal Law, 79
Harv. L. Rev. 635, 636–645 (1966).

[33] Convictions of chronic alcoholics for violations of public intoxi-
cation statutes have been invalidated on Eighth Amendment grounds
in two circuits. See *Easter* v. *District of Columbia,* 124 U. S. App.
D. C. 33, 361 F. 2d 50 (1966); *Driver* v. *Hinnant,* 356 F. 2d 761
(C. A. 4th Cir. 1966).

a public place would be "cruel and inhuman punishment" within the prohibition of the Eighth Amendment.  This conclusion follows because appellant is a "chronic alcoholic" who, according to the trier of fact, cannot resist the "constant excessive consumption of alcohol" and does not appear in public by his own volition but under a "compulsion" which is part of his condition.

I would reverse the judgment below.