# Drugs and Driving

PACKEL, Attorney General, January 11, 1974.— Your agencies have both requested advice concerning the operating privileges of persons licensed to drive in the Commonwealth of Pennsylvania who are in drug-free treatment programs or in approved methadone treatment programs. Four questions have been posed. Can an individual in a drug-free treatment program obtain a driver's license or permit and does PennDOT have the authority to refuse such an individual a driver's license or permit? Does PennDOT have the authority to suspend the operating privileges of an individual in a drug-free treatment program? Does an individual in an approved methadone treatment program have the right to obtain a driver's license or permit and does PennDOT have the authority to refuse a license or permit to such an individual? Lastly, does PennDOT have the authority to suspend the operating privileges of an individual in an approved methadone treatment program?

It is our opinion, and you are so advised, that (1) an individual in a drug-free treatment program can obtain a driver's license or permit and PennDOT does not have the authority to refuse a driver's license or permit solely on the ground that such an individual is in a drug-free treatment program; (2) PennDOT does not have the authority to suspend the operating privileges of an individual solely on the ground that he or she is receiving treatment in a drug-free program; (3) PennDOT has the authority and is required to refuse a license or permit to an individual in an approved methadone program providing the individual is, in fact, addicted to the use of narcotic drugs. The secretary must afford the applicant an opportunity to have a hearing on the issue of drug addiction and shall give the applicant the opportunity to show that the drug addiction does not render the applicant

incompetent to drive or is not disabling to the extent that it would be unsafe for the applicant to drive; and (4) PennDOT has the authority to suspend the operating privileges of an individual receiving treatment in an approved methadone program provided that PennDOT affords the individual an opportunity for a hearing and determines that such a person is incompetent to operate a motor vehicle or is afflicted with mental or physical infirmities or disabilities making it unsafe for such person to operate a motor vehicle.

The issues presented involve an unfortunate collision of important public policies. Highway safety is of paramount concern to Commonwealth officials. Our citizens must be protected at all times from unnecessary traffic safety hazards. At the same time, this Commonwealth has a serious drug abuse and narcotic addiction problem. As a matter of human compassion, government officials are enjoined to assist people to avoid drug abuse and to overcome narcotic addiction. It is also in the interest of the Commonwealth and its citizens to rehabilitate drug abusers and narcotic addicts that are presently a drain on society through their inability to function and those that commit crimes to satisfy their habit and uncontrollable addiction. We have considered these policies and goals very carefully in formulating this opinion.

The Secretary of PennDOT is required under section 604(a)(5) of The Vehicle Code of April 29, 1959, P. L. 58, as amended, 75 PS §604(a)(5), to refuse a permit or license to an applicant:

"(5) If he is . . . addicted to the use of narcotic drugs.

"6. If he has been adjudged insane or an idiot, imbecile, epileptic or feebleminded, until restored to competency by judicial decree, or released from a hospital for the insane, or feebleminded, upon certifi-

cation by the superintendent or medical director that such person is competent, nor then, unless the secretary is satisfied such person is competent to operate a motor vehicle or tractor with safety to persons and property.

"(7) If he is afflicted with, or suffering from, a physical or mental disability or disease, or from a weakness or disability in vision or hearing which, in the opinion of the secretary, will prevent such person from exercising reasonable and ordinary control over a motor vehicle or tractor."

The secretary also has the discretion to suspend a person's operating privileges if the person is not competent or if it is unsafe for that person to operate a motor vehicle. This may be done in accordance with section 618(a)(1) of The Vehicle Code, supra, 75 PS §618(a)(1), which states, in part, that operating privileges may be suspended whenever the Secretary finds upon sufficient evidence:

"That such person is *incompetent* to operate a motor vehicle or tractor, *or is afflicted with mental or physical infirmities or disabilities rendering it unsafe* for such person to operate a motor vehicle or tractor upon the highways." (Italics supplied.)

The Secretary of PennDOT also has the discretion to suspend a person's operating privileges whenever the secretary finds upon sufficient evidence:

"That such person is incompetent or unable to exercise reasonable and ordinary control over a vehicle": The Vehicle Code, supra, sec. 618(b)(5), 75 PS §618(b)(5).

Sections 618(a)(1) and 618(b)(5) have been construed by a series of lower court decisions to require the Commonwealth to establish "incompetency" by sufficient evidence. Invariably, mere illegal use and possession of narcotic drugs have been held insuffi-

cient to warrant suspension of a license. See Commonwealth v. Hillyer, 120 Pitts. L.J. 219 (1972); Commonwealth v. Weiner, 42 D. & C. 2d 164 (1967); Morath Appeal 58 D. & C. 2d 432 (1972) (Use of marijuana not sufficient to prove incompetency); Bishop Appeal, 11 D. & C. 2d 311 (1956) (use of demerol not sufficient). See also Hancox License, 30 D. & C. 2d 686 (1963), and Newmaker License, 26 D. & C. 2d 779 (1961), on the analogous issue under the same statutes of alcohol use.[1]

A person in a drug-free treatment program receives no narcotic from the program for his or her physical dependencies. Therefore, a person in a drug-free treatment program cannot be presumed addicted to the use of narcotics. Moreover, there is no evidence to presume that a person in a drug-free treatment program would drive differently from that of the norm of the population or would constitute a traffic safety hazard.

On the basis of the foregoing discussion, we have concluded that there is no basis whatsoever to refuse a license or permit or to suspend the operating privileges of anyone merely because a person is in a drug-free treatment program and such a practice, if it exists, must cease immediately.

We have received information which indicates that

---

[1] Section 616 of The Vehicle Code, 75 PS §616, provides for revocation of operating privileges for one year upon conviction or plea of guilty or nolo contendere to a series of offenses which include operating under the influence of a narcotic drug, unlawful possession or transportation of substances (drugs) controlled under the Controlled Substances Act. Revocation upon conviction or plea is automatic under this section. This opinion assumes that persons in drug-free or methadone treatment programs who seek to obtain or retain a license or permit and are the subject of this opinion, have not been convicted of an offense requiring revocation.

the present policy of PennDOT is to refuse to issue a driver's license or permit to persons in an approved methadone treatment program and to suspend the operating privileges of persons in those programs until such time as they are able to reestablish their "competency" to operate a motor vehicle. Data has been submitted which indicates that methadone is designed to rehabilitate heroin addicts, and that current policies of PennDOT effectively discourage some addicts from seeking rehabilitation offered by an approved methadone treatment program.

There can be no question that a person in such a program who regularly uses or is dependent on methadone is addicted to the use of narcotic drugs. However, there remains a question of statutory interpretation as to whether, pursuant to section 604(a)(5) of The Vehicle Code, supra, 75 PS §604(a)(5), a driver's license or permit may be refused to a person in a methadone treatment program solely on the ground that such person is addicted to a narcotic drug. As noted above, section 604(a)(5) requires denial of a license or permit on the ground that a person is addicted to narcotic drugs. That provision also requires in subsections (6) and (7) that a license or permit be refused on grounds of incompetency or disability. However, section 618 of The Vehicle Code, the section describing circumstances under which operating privileges are suspended, makes no provision for suspension merely on the ground of addiction to narcotic drugs. On the contrary, section 618 requires the secretary to show incompetency or physical or mental disability.

There is no significant distinction between the refusal to issue a new license or permit to an applicant and the suspension of operating privileges for purposes of highway safety. It would appear that the

objections of preventing highway accidents or reducing the risk of highway accidents would require the same tests for new licenses and permits as well as continued use of operating privileges.[2]

On the basis of this analysis, there is a serious question whether the more restrictive condition of section 604, which prohibits issuance if the applicant is addicted to narcotic drugs, can withstand constitutional tests. Firstly, we have a classification: applicants and operators, and difference in treatment of both classes; applicants can be denied a license for addiction to narcotic drugs and the secretary must show incompetency or physical or mental disability to suspend. Secondly, as noted above, the difference in treatment is only marginally related to legitimate State purposes. Thirdly, in regulating operator's licenses and permits, the State is regulating an essential aspect of the individual's daily existence. See Bell v. Burson, 402 U.S. 535 (1971). Finally, we question the need for subsection (a)(5) of section 604 in light of subsections (a)(6) and (7) which clearly require refusal to issue a license if incompetency or physical or mental infirmity is present. Singling out narcotic addiction and habitual drunkenness, as section 604(a)(5) does, smacks of punishment and moreover, punishment of a status, which individuals, occupying the status, are helpless to change. The Supreme Court of the United States has held that punishment, in the form

---

[2] There is a scintilla of a distinction in that it can be argued that new operators are not experienced drivers hence the requirements must be more stringent for issuance than suspension. This argument, however, breaks down in view of the fact that new residents of Pennsylvania who are experienced drivers from their states of former residence are required to meet the same written and medical tests as totally unexperienced drivers in order to obtain a Pennsylvania license and they can be required to take an operator's examination as well.

of criminal sanctions, of the status of narcotic addiction, is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments: Robinson v. California, 370 U.S. 660 (1962); cf. Powell v. Texas, 392 U.S. 514 (1968).

There is also, of course, the presumption of constitutionality of all legislation and the concomitant doctrine of statutory construction requiring interpretation of statutes so as to preserve their constitutionality. Such an interpretation is even more compelling in connection with subsection (a)(5) of section 604 where there is no question that the prohibition against issuance of a license or permit to a narcotic addict or alcoholic bears a substantial relationship to the purpose of promoting highway safety. As we have discussed above, the objections to subsection (a)(5) of section 604 are that it singles out applicants for licenses and permits and imposes upon them more restrictive impediments to licensing than present license or permit holders, all for no apparent safety purpose.

In this light we read subsection (a)(5) of section 604 as requiring the secretary to refuse to issue a license or permit to an applicant if the secretary knows or has reason to know that the applicant is a narcotic addict. As we have already indicated, the fact of any applicant's enrollment in a methadone treatment program gives the secretary reason to believe the applicant is addicted to narcotic drugs.

However, to assure that applicants for licenses and permits are not subjected to impermissibly different standards than present holders of licenses or permits, the secretary must notify the applicant so denied of his or her right to a hearing on whether a license or permit should issue. Upon hearing, the secretary will have the burden of proving narcotic addiction and

the applicant will have to rebut the evidence of addiction or show that the addiction is such that the applicant is not incompetent and that the addiction does not rise to the level of a physical or mental disability making it unsafe for the applicant to operate a motor vehicle.

By interpreting section 604(a)(5) to require refusal to issue a license or permit in the first instance when the secretary knows or has reason to know that the applicant suffers from narcotic addiction due deference is given to the special significance in the statutory scheme of section 604(a)(5). At the same time, by providing the applicant with an opportunity to show that the addiction is not disabling, substantially equivalent standards are obtained for both applicants and license and permit holders.

As to the question of suspending the operating privileges of an individual in an approved methadone treatment program, PennDOT must afford notice of a hearing and a hearing on the issue of incompetency prior to suspension. It should be noted, in keeping with the decision in the series of cases, supra, that section 618(a)(1) or (b)(5) of The Vehicle Code requires a finding that more than some or irregular and infrequent drug use is required to support a finding that a person is incompetent, afflicted with a mental or physical infirmity or disability or unable to exercise reasonable and ordinary control over, a vehicle.

That there is sufficient evidence to find that a person is not competent or unsafe or unable to operate or control a motor vehicle is the only basis for the suspension of that person's operating privileges, and the fact that the person is in a methadone treatment program by itself, is never sufficient evidence to warrant suspension of a license or permit. It should be crystal clear that section 618(a)(1) and (b)(5) of The Vehicle

Code, 75 PS §618(a)(1) and (b)(5), may not be interpreted in such a manner as to ipso facto deem persons in such approved methadone treatment programs as incompetent or afflicted or unsafe or unable as delineated by statute.

Finally, we suggest that there be a legislative re-examination of this aspect of the law. Literature that we have reviewed indicates that there is no difference between the driving records of people on methadone and the ordinary driver. There is no scientific evidence to indicate that driving by a methadone patient is any more dangerous than driving in a drug-free state. Moreover, there is nothing to indicate that a person using methadone would be more likely to have accidents than a control group of average citizens.[3]

Accordingly, overly broad prohibitions against methadone patients receiving licenses or permits do not appear warranted and may be counter productive.

In accordance with foregoing opinion, you are advised: (1) an individual in a drug-free treatment program can obtain a driver's license or permit and PennDOT does not have the authority to refuse a driver's license or permit solely on the ground that such an individual is in a drug-free treatment program; (2) PennDOT does not have the authority to suspend the operating privileges of an individual solely on the ground that he or she is receiving treatment in a drug-free program; (3) PennDOT has the

---

[3] See the report by Mr. Arthur Moffett, Deputy Chief, Section on Drug and Alcohol Abuse, Pennsylvania Medical College. This is a unit, funded by the State, to provide information on drug abuse. It has on its staff some of the leading experts on drug abuse. See also, the study of Dunlap Associates of Darien, Connecticut for the National Highway Safety Administration. Both reports support the positions indicated above with respect to drugs and driving.

authority, and is required, to refuse a license or permit to an individual in an approved methadone program providing the individual is, in fact, addicted to the use of narcotic drugs. The secretary must afford the applicant an opportunity to have a hearing on the issue of drug addiction and the applicant shall be given the opportunity to show that the drug addiction does not render the applicant incompetent to drive or is not disabling to the extent that it would be unsafe for the applicant to drive; (4) PennDOT has the authority to suspend the operating privileges of an individual receiving treatment in an approved methadone program provided that PennDOT affords the individual an opportunity for a hearing and determines that such a person is incompetent to operate a motor vehicle or is afflicted with mental or physical infirmities or disabilities making it unsafe for such person to operate a motor vehicle.

You are also advised to promulgate the necessary and appropriate regulations in accordance with this opinion.