**UNITED STATES of America**

**v.**

**Danny Howard MAYS and Norval Wayne Holloway, Jr.**

**Crim. No. H–78–91.**

United States District Court, S. D. Texas, Houston Division.

May 14, 1979.

J. A. "Tony" Canales, U. S. Atty., Lupe Salinas, Mary L. Sinderson, and George A. Kelt, Jr., Houston, Tex., for the United States of America.

Jan W. Fox and Ray A. Bass, III, Houston, Tex., for defendant Danny Howard Mays.

John A. Pizzitola and Michael J. Hinton, Houston, Tex., for defendant Norval Wayne Holloway, Jr.

## MEMORANDUM CONCERNING REASONS FOR SENTENCE IMPOSED

COWAN, District Judge.

### I.

### INTRODUCTION

Enunciation of reasons for a sentencing decision is proper. See, e. g., *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) (Black, J.); *Torres v. United States,* 564 F.2d 617 (1st Cir. 1977); *United States v. Foss,* 501 F.2d 522 (1st Cir. 1974); *Moore v. United States,* 571 F.2d 179 (3rd Cir. 1978), see cases collected in footnote 10. Some courts have suggested that such a statement should be required. See *United States v. Bazzano,* 570 F.2d 1120, at 1130 (3rd Cir. 1977) and *McGee v. United States,* 462 F.2d 243 (2nd Cir. 1972). Statement of these reasons is obviously helpful in the light of possible appellate review.

The sentencing issues in this case are close ones about which there can legitimately be considerable debate. The real issues are whether a period of incarceration is necessary to deter other officers from similar conduct and whether incarceration is proper for these defendants.

This case has received considerable public and media attention.

These factors make it advisable to record in detail this court's reasoning.

This court, while fully recognizing its own fallibility and frailties, is the only entity who has heard all the evidence in this case, reviewed all of the voluminous materials submitted for examination *in camera* during the course of this trial, and reviewed all aspects of the pre-sentence investigation prepared by the Probation Office of the United States District Court for the Southern District of Texas. The undersigned has sufficient faith to believe that well-informed, responsible public opinion will recognize that sentencing decisions must be based upon all of the facts, not upon the distorted view which one might obtain from a partial view of some of the facts.

While the principal fact-finding function in this matter rested upon the jury, the authorities teach that:

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.

*Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933) (Hughes, C. J.). See also *United States v. Baer,* 575 F.2d 1295 (10th Cir. 1978) where the court said:

> . . . Part of the trial judge's obligation is to aid in ferreting out the truth in a fair and impartial manner.

*Id.,* 575 F.2d at 1302.

After very careful and detailed consideration of voluminous material, i. e., the trial testimony, the material submitted for *in camera* inspection during and before trial, and the pre-sentence investigation, this court concludes that the most just sentences are:

> Danny Howard Mays: A sentence of five years on each count, such periods of time to be served concurrently; however execution of the sentence will be suspended and the defendant placed upon supervised probation for a period of five years, pursuant to the authority granted this court by 18 U.S.C. § 3651.
>
> Norval Wayne Holloway, Jr.: A sentence of five years on each count, such periods to be served concurrently; however, exe-

cution of the sentence will be suspended and the defendant placed on supervised probation for a period of five years, pursuant to the authority granted this court by 18 U.S.C. § 3651.

The court specifically finds, for the reasons stated herein, that the ends of justice and the best interest of the public and the defendants will be served by such statutorily authorized suspension of sentence and probation.

## II.

### FACTS OF THE EVENT

The three key facts are:

1. The defendants' initial actions were taken in an atmosphere of extreme stress, without any opportunity for calm reflection, premeditation, or careful, conscious, considered choice of alternatives. Defendants were thrust into a stressful, emergency situation; they did not create the emergency. These defendants acted, and the patterns of their future actions were set, in a few seconds of anxious urgency in a dangerous street—not in the comparative peace and quiet of a calm, safe, air-conditioned room.

2. After an initial, panic-induced decision to twist the truth, defendants persisted in their cover-up at least in part because of loyalty to their comrades. Holloway, particularly, had no motivation to protect himself and allowed himself to go along with a decision made by others. Mays could, after the initial decision, have told the truth only by implicating men who had taken a considerable risk to protect him. This loyalty, while inadvisable, cannot realistically be totally condemned.

3. These two defendants are not the most culpable of those who participated in the conspiracy. They were not the conspiracy's originators or its principal perpetrators. Olin, probably the most culpable, will in all reasonable probability serve no penitentiary time. Byrd, considerably more culpable than either

of these defendants, has limited his exposure to three years by his plea bargain. Daffern, who also committed perjury, with considerably less justification than these defendants, was not and will not be incarcerated. Many courts have applied the common-sense rule, supported by simple justice, that disparity in punishment for similar behavior should be avoided. See e. g. *United States v. Bowser,* 497 F.2d 1017 (4th Cir. 1974).

In this case, as in any similar situation, there is some difficulty in determining exactly what occurred. This is true because the events occurred very quickly, under high stress. All of the participants were disturbed emotionally. The testimony of John Thomas Olin and William Byrd is testimony which has been purchased by grants of immunity. This immunized testimony must be viewed with great caution, particularly in the light of the demonstrable fact that Olin, in his various grand jury appearances, became more and more helpful to the Government's position in each subsequent grand jury appearance. The jury verdict, as this court construes it, essentially rejects the credibility of much of Olin's, Byrd's and Dolan's testimony. Dolan was probably not in the position he claims to have occupied and his testimony is to a degree suspect.

With these limitations, however, there are a number of facts which are firmly established by either reliable, corroborated testimony, by the electronic tape of the chase, by reliable physical evidence, or by the jury verdict. These relevant, well-established facts are:

1. This entire episode, which terminated the life of Randall Alan Webster and seriously blighted the lives of the officers involved, commenced when Randall Alan Webster stole a van, drove it through a plate glass window, engaged police officers in a wild chase in which he refused to respond to police officers' signals to stop, exceeded 100 miles per hour, and attempted to ram police vehicles. This chase placed the lives of these two defendants in jeopardy. This chase, which these defendants did not create but which they had a duty to control, placed in jeopardy the lives of an indeterminate number of motorists.

2. During this chase the officers believed that there was a strong possibility that someone inside the van was brandishing a weapon. As it turned out, this perception was inaccurate; however, the fact that the officers perceived this to be the case is established by a mechanical tape made during the chase, at a time when there would have been little opportunity and little motive for fabrication.

3. The officers most immediately involved in this chase including the two defendants here, were excited, apprehensive, frightened, and justifiably angered at the actions of both Randall Alan Webster and Billy Junior Dolan, the cab driver who purported to assist in the chase and actually interfered in the police activities.

4. Ultimately the van being pursued spun out of control and came to a stop. The officers in question legitimately believed that their lives were in danger, and knew without question that the suspect whom they had been pursuing had been acting in a violent, irrational manner by refusing to respond to signals to stop, and attempting to ram the police vehicles.

5. The precise details of what occurred when Mays ran up to Webster will always be shrouded in some mystery. Mays, because of the shock of the event and the rapidity with which things occurred, does not know and has never known with certainty exactly what happened. The Government's evidence comes from witnesses whose credibility is suspect. The physical facts are ambiguous.

6. Webster was shot through the head.

7. The physical facts (i. e., the autopsy findings) do not support a conclusion that Webster was thrown violently to the pavement or beaten before he was shot.

8. The bullet came from Mays' weapon.
9. Tapes of the chase reveal that within 77 seconds after the van had stopped, Mays had called for an ambulance, an action clearly consistent with the conclusion that the shooting was essentially an accident and not an intentional violation of Webster's civil rights.
10. Mays did not intentionally violate Webster's civil rights. This jury finding, as the court construes it, establishes that Mays did not approach Webster with the intent of either shooting him or inflicting upon him more physical harm than was reasonably necessary to assure his own safety and that of his fellow officers.

All of the witnesses agree that immediately after the shooting Mays was in a state of complete shock.

The only evidence of Mays' agreement to the use of a "throw-down" and a "cover-up" at the scene itself, is from Olin, whose testimony is, as indicated before, highly suspect.

While the precise chronology cannot be established, all of the evidence indicates that if Mays, at the scene, actually agreed to the use of a "throw-down," his agreement occurred at some time within the first two minutes after the shooting, while he was, according to all the evidence, in a state of shock and extreme agitation.

This court is convinced, with very little room for doubt, that Holloway played no part in "planting" the throw-down gun on or about Randall Alan Webster's person. The basis for this conviction lies first in the physical facts, which are totally inconsistent with the evidence concerning Holloway's alleged actions in "planting" the throw-down on Webster's person. Second, from an analysis of the testimony, this court is persuaded that Byrd's testimony before this court concerning Holloway's action was mere "frosting on the cake," devised for the purpose of enabling Byrd to try to make a better "deal" with the Government.

A throw-down gun had been placed on the pavement within a very few minutes after the van spun to a stop. By that time the die was cast. After the throw-down gun was actually placed upon the pavement, none of these officers was at liberty to be completely candid about the event without seriously implicating fellow officers.

While no one can speculate with complete confidence on what would have occurred if the matter had been handled differently, the overwhelming probabilities are that if these officers had told the truth about this situation from the start, this matter would have been presented to a Harris County Grand Jury, no indictments would have been returned, no federal investigation would have ensued, and the lives of these defendants, Dillon, Bloodworth, Byrd, Estes, and Daffern would never have been blighted.

### III.

### ANALYSIS OF JUSTIFICATION FOR INCARCERATION

A. *Rehabilitation of Offenders and Individualizing of Sentencing*

Incarceration of these defendants cannot be justified on the basis of rehabilitation. Both are now and always have been useful citizens, with family obligations, responsibilities to employers who believe in and need them. Even if these defendants were allowed to return to work as police officers (a highly unlikely contingency) it is unlikely that either of the defendants would repeat the conduct which has already inflicted upon him the substantial punishments described below.

This court has a legally imposed duty to individualize sentences in this and all other cases. In *Williams v. New York,* 337 U.S. 241, at 248, 69 S.Ct. 1079, at 1083–84, 93 L.Ed. 1337 the Supreme Court instructs that:

The belief no longer prevails that every offense in a like legal category calls for identical punishment without regard to the past life and habits of a particular offender. This whole country has traveled far from the period in which the

death sentence was an automatic and commonplace result of convictions—even for offenses today deemed trivial. Today's philosophy of individualizing sentences makes sharp distinctions for example, between first and repeated offenders. Indeterminate sentences, the ultimate termination of which are sometimes decided by nonjudicial agencies have to a large extent taken the place of the old rigidly fixed punishments. The practice of probation which relies heavily on nonjudicial implementation has been accepted as a wise policy. . . . Retribution is no longer the dominant objective of the criminal law.

The Supreme Court has stated in *Williams v. Oklahoma,* 358 U.S. 576, at 585, 79 S.Ct. 421, 427, 3 L.Ed.2d 516 that a sentencing judge is *required* to "consider all of the mitigating and aggravating circumstances involved in the crime."

These defendants, like all criminal defendants in any case, are unique individuals, entitled to be treated as such.

The conduct of the defendants here is totally different from that of the majority of the offenders who appear before this court. Most defendants before this court for sentencing are persons who have engaged in illegal activity intentionally, under circumstances where the decision to engage in the activity was deliberate, intentional, with full opportunity to consider the alternatives and involving no elements of loyalty to fellow workers.

### B. *Protection of Society from Violent Tendencies of These Defendants*

The most rational justification for incarceration is the protection of society from a person who has shown a recognized violent tendency. The entire background of these defendants, as reflected in the trial testimony and the pre-sentence investigation, indicates that incarceration of these defendants cannot be justified on the basis of protecting society from any dangerous tendency. Both have spotless records before and after the event in question. Neither is a violent man. The jury has acquitted Mays of intentional violation of Webster's civil rights.

### C. *Punishment or Retribution*

Justice Black said in *Williams v. New York, supra,* that:

. . . Retribution is no longer the dominant objective of the criminal law. *Id,* 337 U.S. 241, at 248, 69 S.Ct. 1079, at 1084, 93 L.Ed. 1337.

While it may not be apparent to the casual or biased observer, these defendants have been severely punished. Both defendants, dedicated professionals, have been deprived of their profession. Mays has stated, and the court believes truly, that all he ever wanted to be was a good officer. He had always been a good officer before this offense changed his life.

Holloway's superiors rate him an outstanding officer.

Were it not for this tragic event, both of these men would have continued to serve the City of Houston in their profession with distinction and dedication for many years. Both have been relegated, probably permanently, to a life's work which is second or third choice.

Assuming even moderate counsel fees, both defendants have been subjected to ruinous legal expense in light of their limited financial resources.

These defendants have seen their families subjected to enormous anxiety, expense and humiliation.

These defendants have been subjected to public humiliation and intense media and unfriendly public scrutiny.

From materials submitted to this court *in camera* during the trial of the case, the court knows that Mays has been subjected to threats upon his bodily safety.

These men have faced the awesome, enormous power of a Government legally authorized to purchase testimony by grants of immunity and prosecute them with unlimited resources.

Defendants will now have all of the limitations and disabilities of convicted felons.

This court is firmly persuaded that these defendants have been punished enough.

One other factor is significant in the court's thinking on the question of punishment or retribution. The practices and customs of our society (as incorporated in the regulations of the Houston Police Department) mandate that officers live armed. Regulations require officers to carry weapons on and off duty. There exist nations in which this is not the practice. In any large metropolitan area, with thousands of armed officers, and millions of private citizens on the streets, accidents involving firearms are inevitable and unavoidable—no matter how restrained the officers, and no matter how carefully trained or diligently selected.

Among the millions of citizens with whom officers come in contact, there is inevitably a small percentage who will engage in conduct which will either place officers in jeopardy, or place the officer in a position in which he in good faith believes that he is in jeopardy. Experience and common sense teach that some of these events will occur in situations in which (in the light of hindsight) it will appear that the officers were not actually in danger at the time of the use of deadly force. This case is one of those situations, as was the case of *Milton Glover v. R. L. Watson*, CA 76–H–1961 (DC SD Tx), tried to a jury verdict in this court previously. Any thinking person realizes, and the law teaches, that these situations (i. e., those situations in which the officer is not actually in danger but perceives in good faith that he or his comrades are in danger) must be viewed not in the 20/20 light of hindsight, but in the light of the situation as it appeared to the officer at the instant in which the decision had to be made to use or not to use deadly force. Imposing severe punishment upon an officer who had reacted reasonably in the light of the circumstances, and who had no intent to violate the suspect's civil rights is simply unfair. Harsh punishment in these circumstances is unfair to men who assume, without notable financial reward, more than their share of the risks of living, working, and enforcing the law in a major metropolis.

### F. Deterrence of Others from the Commission of Like Offenses

Despite the emphasis upon individualizing sentences under the modern practice, it is still proper for the court to consider the effect of the sentence in the deterrence of others from the commission of like offenses. See *Williams v. New York,* 337 U.S. at 248, f. 13, 69 S.Ct. 1079.

The strongest justification for the incarceration of these defendants is· the argument that police officers subjected to stressful situations such as that encountered in this case must be encouraged to be truthful with their supervisors and investigating grand juries. This is a legitimate argument and one which has given this court considerable difficulty.

There is authoritative support for the view that "calculated crimes" are more likely to be deterred by severe punishment than crimes of passion. See *Powell v. Texas,* 392 U.S. 514 at 531, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). While the crimes here perhaps do not fall cleanly within either category, these crimes come closer to crimes of passion" than they do to "calculated crimes" because the pattern of this offense was fixed during the few hectic, perplexing and confused minutes immediately after the shooting.

Reduced to its essentials, however, the question is whether incarceration of Holloway and Mays will be reasonably calculated to deter other officers from similar offenses. There is no way to determine this question with complete certainty. However, after giving this matter serious and prolonged thought, the undersigned is persuaded that committing Holloway and Mays, or either of them, to a period of incarceration might deter others from committing similar offenses, but this conclusion must be based upon speculation and conjecture. There is a very strong possibility that committing Mays, or Holloway, to the penitentiary would have absolutely no effect upon deterring similar conduct in other officers.

Conduct of the type which led to these convictions can probably be best prevented by two factors:

First, continuing long-range programs to install professionalism into police officers. Such programs must, of course, be the responsibility of the leadership of the Police Department and is a function which the federal judiciary cannot undertake directly or indirectly. Second, a conviction on the part of police officers that they will be treated fairly if the truth is known and a further conviction that episodes of this nature will be thoroughly investigated so that cover-ups will entail a high risk of discovery.

The prosecution of this case has served a useful purpose. The United States Attorney's office served the public well by its diligence in discovering the evidence that the gun was a "throw-down." Police officers should know that episodes of this nature will be thoroughly and not merely superficially investigated. It seems likely that this will occur in the future. Certainly it must be a matter of some embarrassment to the Houston Police Department that the United States Attorney's office—rather than HPD officials—discovered the evidence which proved almost conclusively that this was a "throw-down" case. The court believes that the HPD will be motivated to avoid future embarrassments of this nature and that future episodes of this type will be thoroughly investigated by state officials. Some may regard this hope as naive, but this court is persuaded that optimism is realistic.

Imposing a period of incarceration upon Mays and Holloway would probably serve no useful purpose. Balanced against the possibility that some valid deterrent effect might be served by sending these men to jail is the almost certain fact that their incarceration would have severe detrimental consequences upon Holloway's second-grade child and upon Mays' wife and infant child. Balancing certain harm to innocent people against possible speculative benefit makes the decision of this matter fairly easy.

From all of the voluminous material which the court has been obligated to hear or review, including the trial testimony of many Police Department officials, the review of much of the grand jury testimony, the undersigned is persuaded that the practice of using "throw-down" guns is not and has never been widespread in the Houston Police Department. Of all of the officers who gathered at this scene immediately after this event, only Byrd, as this court views the facts, had a "throw-down." It is undisputed that neither of these defendants ever had carried a "throw-down" gun. There is evidence, in the *in camera* material submitted to this court, that the practice is frowned upon and discouraged by experienced, first-line supervisors in the Police Department. There is no evidence that the practice had ever been condoned by any supervisory personnel.

The jury's verdict, as does this court, totally rejects Olin's purchased testimony attempting to implicate Sgt. Dillon.

Any reasonable police officers, having knowledge of the blighted lives of all of the participants in this conspiracy, and knowing that episodes of this nature are likely to be thoroughly investigated by his own department, by the Harris County Grand Jury, and by the federal authorities, would seem to have ample deterrence to overcome any temptation to use a "throw-down" weapon or to falsify to his supervisors concerning episodes of this nature.

This court acknowledges that a very persuasive argument could be made that a substantial period of incarceration in this case might serve as a strong deterrent to prevent conduct of this nature in the future. This is a good, legitimate and valid argument, and the court has rejected it primarily because this court is persuaded that a harsh sentence of this nature is unnecessary, and because of the counter-possibility that such harshness might serve to deter intelligent and thoughtful men and women from choosing a career as police officers.

Most significant in this court's thinking, however, is the conviction that the period of incarceration for these two defendants, under all of the circumstances discussed in this opinion, would simply be unjust, unreason-

able, unduly harsh and not justified by facts as found by the jury and perceived by this court.

If in fact the imposition of incarceration would serve, realistically to deter conduct of the type for which these defendants were convicted, a sensible and logical sentence would be a 10-year period of incarceration. To the Government's credit, not even counsel for the Government (who are charged with representing their client vigorously and have done so) have argued for a sentence of this harshness. The possibility of imposing a 10-year sentence, however, is a very real possibility which this court seriously considered and would have been inclined to impose before hearing the evidence and arguments at the sentencing hearing, reviewing the authorities cited herein, and giving the entire matter the most careful thought possible. This case is an excellent illustration of the desirability of the sentencing procedure prescribed by law; for, without such sentencing procedure and a review of the authorities cited herein, the court would probably have entered a very harsh sentence which the court is now persuaded would have been totally unjust. See in this connection, *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1976); *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); and *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

## CONCLUSION

It may be argued that the termination of this case without incarceration of a convicted officer has been a waste of government and judicial resources and an encouragement to officers to engage in reckless conduct. Not so, in this court's opinion. The vigilance and persistence of the United States Attorney's office in discovering the records which made it possible to prosecute this case, the vigorous prosecution of this case, and the high probability that similar situations will be thoroughly investigated by the authorities as well as the public refute a negative view.

Judgment will be entered in accord with the conclusions stated herein.