Judge MANNHEIMER,
concurring.
This case involves an unusual cireum-stance: the defendant, William E., Palmer, was charged with several counts of assault, and he wished to defend these charges by asserting that his assaultive behavior was the result of a ruptured aneurysm in his brain.
The issues presented in this appeal stem primarily from profound disagreements between the attorneys and the trial judge as to (1) how to categorize this defense legally, and (2) how the defense should be litigated procedurally.
Palmer's attorney claimed that the ruptured aneurysm and the resulting hemorrhage within Palmer's brain deprived Palmer of his capacity to act "voluntarily" (as that term is used in the eriminal law), This claim has factual components-for instance, whether, Palmer's assault on the troopers was inconsistent with his "baseline" behavior (i.e., his pre-aneurysm behavior), and whether Palmer's aneurysm ruptured before Palmer threatened the troopers with the firearm or, instead, immediately afterwards, while the troopers were struggling with Palmer to physically subdue him. -
The answers to these questions are not self-evident, and they potentially involve either neurological expertise, or psychological expertise, or both. For this reason, the superior court could properly require Palmer's attorney to support his proposed defense with expert testimony-and require him to reveal this anticipated expert testimony to the State before trial,
But as Judge Allard's lead opinion explains, the expert analysis that would be needed to answer these questions is not nee-essarily the kind of analysis that would be derived from the psychiatric examinations authorized by AS 1247.070. Palmer's attorney in fact contended that he could reasonably base his proposed defense on other types of expertise, The superior court should have given the defense attorney the opportunity to show that this was true before the court ordered Palmer to undergo psychiatric evaluation under AS 12.47.070,
Palmer's proposed defense also raised legal questions. Most importantly, Palmer asserted that if his assaultive behavior was indeed the result of behavioral changes caused by his ruptured aneurysm, then his actions were not "voluntary" for purposes of the criminal law.
The law does not punish people for involuntary acts or omissions. As stated in AS 11.81.600(a), "The minimal requirement for criminal liability is ... a voluntary act or the omission to perform an act that the person is capable of performing." For purposes of imposing criminal lability, the law does not view an involuntary action as an "act".[1] Thus, if a defendant's actions were "involuntary" (within this specialized sense), the govern *992 ment will have failed to prove the "actus reus" of the charged erime. There is general agreement that bodily movements resulting from reflex or convulsion are not "voluntary".[2] There is also general agreement that bodily movements performed during unconsciousness or sleep are not "voluntary".[3] But a person's conscious bodily movements remain "voluntary" even when, due to mental illness, the person feels an "irresistible impulse" to engage in that conduct.[4]
As Judge Allard's lead opinion notes, some courts have held that when a person's consciousness is altered by an acute brain infu-ry, the person is entitled to argue that their ensuing conduct was not "voluntary". But the question of whether a person's actions should be deemed "voluntary" or "involuntary" for purposes of the eriminal law is ultimately not a medical question. It is, instead, a question of social policy: Under what cireumstances are we going to hold people criminally accountable for their actions? As the United States Supreme Court noted in Powell v. Texas, "(tlhe doctrines of actus reus, mens rea, insanity, mistake, justification, and duress" are all tools that our society employs to make "a constantly shifting adjustment ... between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man." [5]
When a person's perceptions and behavior are substantially affected by a brain hemorrhage or other brain trauma, some might reasonably analogize the situation to sleepwalking or "automatism"-thus reaching the conclusion that if the person engages in as-saultive conduct, that conduct should be deemed "involuntary" for purposes of the criminal law.
But other people might reasonably conclude that the brain hemorrhage has not affected the "voluntariness" of the person's actions-that, instead, the hemorrhage has skewed the person's perception of danger, or has weakened the person's normal ability to subdue their aggressive impulses. Under this view, the person's actions might plausibly be deemed "voluntary" because those actions would remain the product of conscious will.
Because Palmer declined to pursue his "involuntariness" claim, this legal question has not been litigated, and I wish to emphasize that this Court's opinion does not resolve this question.
Judge COATS,
concurring.
At Palmer's sentencing, the superior court stated: "[I] have no doubt, from the record before me, that Mr. Palmer experienced a profound event ...-the physical insult to his brain caused by the aneurysm that changed his behavior.... Mr. Palmer was not himself on the night of the incident, and ... his actions were beyond his control because of this aneurysm." Based on this finding by the superior court, it appears to me that Palmer in all probability had a colorable defense to the crimes with which he was charged-a defense that he was never allowed to present during his trial.
We have remanded this case to allow Palmer an opportunity to present non-psychiatric medical expert testimony in support of his proposed involuntariness defense. I would expand this remand to allow the expert testimony to also address whether the effects of Palmer's aneurysm might cast doubt on whether Palmer had the required mental state to commit the offenses.
I also write separately to clarify that nothing in the majority's decision prevents Palmer from also presenting lay witness testimony on his behavior leading up to and during the crime to support his defense. At sentencing, the court heard testimony from Palmer's girlfriend about Palmer's symptoms before and during the incident-testimony the sentencing court apparently found useful and convincing.

. Rollin M. Perkins & Ronald N. Boyce, Criminal Law (3rd edition 1982), p. 837; Wayne R. La-Fave, Substantive Criminal Law (2nd ed. 2003), § 6.1(c), Vol. 1, pp. 425-29. -

. LaFave, § 6.1(c), Vol. 1, pp. 426-27, 429.

. Id. at 426-27.

. See id. at 428-29.

. 392 U.S. 514, 536, 88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254 (1968).